IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARIO ROSALES,

       Plaintiff,

vs.                                    No. CIV 20-0751 JB/JHR

DAVID BRADSHAW, in his individual
and official capacity, and SHERIFF
BRITT SNYDER, in his individual and
official capacity,

       Defendants.

## MEMORANDUM OPINION[1]

    **THIS MATTER** comes before the Court on: (i) the Board of County Commissioners of

the County of Chaves' Opposed Motion to Intervene, filed July 27, 2020 (Doc. 5)("Motion to

Intervene"); and (ii) Defendant David Bradshaw's Motion to Dismiss on the Basis of Qualified

Immunity and on Other Grounds, filed August 25, 2020 (Doc. 20)("MTD"). The Court held a

hearing on the Motion to Intervene on September 8, 2020, see Clerk's Minutes at 1, filed

September 8, 2020 (Doc. 24); a hearing on the MTD on September 14, 2020, see Clerk's Minutes

at 1, filed September 14, 2020 (Doc. 27); and another hearing on the MTD on September 23, 2020,

see Clerk's Minutes at 1, filed September 23, 2020 (Doc. 37). The primary issues are: (i) whether

the Court should permit Board of County Commissioners of the County of Chaves to intervene

either as of right or permissively under rule 24 of the Federal Rules of Civil Procedure, because

---

[1]On March 31, 2021, the Court entered an Order granting the County of Chaves' Opposed Motion to Intervene, filed July 27, 2020 (Doc. 5), and granting in part and denying in part Defendant Bradshaw's Motion to Dismiss on the Basis of Qualified Immunity and on Other Grounds, filed August 25, 2020 (Doc. 20). See Order at 5-6, filed March 31, 2021 (Doc. 41). In the Order, the Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for the decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

Chaves County has a statutory obligation to cover the liability for torts and civil rights violations of public employees acting in the scope of their duties and Bradshaw has no incentive to argue that Bradshaw was not acting in the scope of his duties; (ii) whether Bradshaw acted under color of law when he pulled his unmarked truck up to Plaintiff Mario Rosales' residence, blocking Rosales in his driveway, threatened Rosales with his firearm, and told Rosales he would ticket him; (iii) whether Bradshaw is entitled to qualified immunity, because (a) Bradshaw did not violate Rosales' rights under the Fourth Amendment to the Constitution of the United States when Bradshaw pointed in a threatening manner his firearm at Rosales, who had a firearm in his pants pocket; or (b) Bradshaw did not violate any clearly established constitutional rights; and (iv) whether Bradshaw committed assault and battery under New Mexico law by pointing his firearm at Rosales in a threatening manner.   The Court concludes that: (i) Chaves County is permitted to intervene both as of right and permissively, because no other remaining party adequately represents its substantial interest, and its defense shares a common question of fact and law with the existing parties; (ii) Bradshaw acted under color of law, because his conduct has a direct relationship to the performance of his public duties; (iii) Bradshaw is entitled to qualified immunity, because (a) although Bradshaw's use of force was objectively unreasonable, given that Rosales kept his hands away from his firearm, was calm, and complied with Bradshaw's commands, (b) Bradshaw did not violate Rosales' clearly established rights, because Rosales was armed when Bradshaw held him at gunpoint; and (iv) the Court will remand this case, and the remaining state law claims of assault and battery, to Chaves County Fifth Judicial District Court, New Mexico, because there are no remaining federal issues before the Court.

## **FACTUAL BACKGROUND**

The Court takes the facts from Rosales' First Amended Complaint, filed July 24, 2020 (Doc. 1-1).  The Court accepts the factual allegations as true for the purposes of the MTD.  See

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012)(concluding that a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor").  The Court does not, however, accept as true the legal conclusions within the First Amended Complaint.  See Ashcroft v. Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

1.      **Background and the Parties.**

This case arises from an altercation between Rosales and Bradshaw on March 18, 2018. See First Amended Complaint ¶¶ 7-46, at 3-7.  Rosales is a resident of Chaves County, New Mexico.  See First Amended Complaint ¶ 1, at 2.  At the time of the incident, Bradshaw was also a resident of Chaves County.  See First Amended Complaint ¶ 2, at 2.  At the time of the incident, Chaves County employed Bradshaw as a Chaves County Sheriff's Office ("CCSO") Sheriff's Deputy.  See First Amended Complaint ¶ 2, at 2.  At the time of the incident, Defendant Britt Snyder was Chaves County Sheriff.  See First Amended Complaint ¶ 2, at 2.

2.      **The March 18, 2018 Altercation.**

On March 18, 2018, Rosales was driving south on North Washington Avenue in Roswell, New Mexico, on his way to his residence.  See First Amended Complaint ¶ 7, at 3.  Rosales was driving behind a black Ford pickup truck that was driven by Bradshaw.  See First Amended Complaint ¶ 8, at 3.  Bradshaw owned the black Ford pickup truck.  See First Amended Complaint ¶ 8, at 3.  After driving past 19th Street, Rosales overtook and passed Bradshaw.  See First Amended Complaint ¶ 9, at 3.  Bradshaw took "great offense" when Rosales passed him.  First Amended Complaint ¶ 9, at 3.  Bradshaw then began to follow Rosales.  See First Amended

Complaint ¶ 10, at 3.  Rosales started taking a series of turns without using his turn signal to determine whether Bradshaw was following him.  See First Amended Complaint ¶ 11, at 3. Bradshaw continued following Rosales as Rosales was making the turns.  See First Amended Complaint ¶ 11, at 3.

While Bradshaw followed Rosales, he called a fellow CCSO Deputy, Rebecca Chavez, and asked her to run Rosales' license plate number.  See First Amended Complaint ¶ 11, at 3.  Chavez told Bradshaw the residence associated with the license plate number.  See First Amended Complaint ¶ 12, at 3.  Chavez told Bradshaw that it appeared that Rosales was heading home.  See First Amended Complaint ¶ 12, at 3.  Bradshaw told Chavez that he did not want her to come to his location.  See First Amended Complaint ¶ 13, at 4.  Chavez decided to ignore Bradshaw's request, because Bradshaw had a reputation at CCSO for having a violent temper, and, based on her training and experience, Chavez had a "gut feeling" that she should go to Rosales' residence. See First Amended Complaint ¶ 14-15, at 3-4.

Before Chavez arrived, Rosales arrived at his residence, parked in the driveway, and waited inside his vehicle.  See First Amended Complaint ¶ 16, at 4.  Seconds later, Bradshaw arrived at Rosales' residence.  See First Amended Complaint ¶ 17, at 4.  Bradshaw parked so that his truck blocked Rosales' driveway, preventing Rosales from leaving.  See First Amended Complaint ¶ 17, at 4.  Afraid to exit his vehicle, Rosales first grabbed his handgun from his car and tucked it in his pants pocket, leaving the handle of the gun visible.  See First Amended Complaint ¶ 18, at 3.

When Rosales stepped outside of his car, Bradshaw started yelling at Rosales and cursing at him in a "loud, threatening, and abusive manner."  See First Amended Complaint ¶ 19, at 4. When Rosales tried to talk to Bradshaw in a reasonable manner, Bradshaw continued to yell at Rosales.  See First Amended Complaint ¶ 20, at 4.  When Bradshaw started making comments

about Rosales' handgun, Rosales stated that New Mexico is an open carry state, that he was exercising his rights, and that he was on private property.  See First Amended Complaint ¶ 21, at 4.

Rosales walked a little closer to Bradshaw to talk in a normal tone of voice, while keeping his hands clear of his handgun.  See First Amended Complaint ¶ 22, at 4.  Bradshaw stated that he was Officer Bradshaw and threatened Rosales with a reckless driving citation.  See First Amended Complaint ¶ 23, at 4.  Bradshaw stated that he had contacted another CCSO officer.  See First Amended Complaint ¶ 23, at 4.  As Rosales and Bradshaw were talking, Bradshaw pulled out a revolver and pointed it at Rosales in a threatening manner.  See First Amended Complaint ¶ 24, at 5.

When a gust of wind blew Rosales' shirt over his handgun, Bradshaw yelled "now that's concealed carry," and raised his gun at Rosales.  First Amended Complaint ¶¶ 25-26, at 5.  When Bradshaw pointed his gun at Rosales, Rosales feared that Bradshaw was going to shoot him.  See First Amended Complaint ¶ 26, at 5.  Rosales put his hands in the air and backed away.  See First Amended Complaint ¶ 27, at 5.  As Rosales was backing away from Bradshaw, Rosales noticed the top of a child's head in the passenger seat of Bradshaw's pickup truck.  See First Amended Complaint ¶ 28, at 5.

Rosales continued trying to reason with Bradshaw; however, Bradshaw stated he would not talk to Rosales until he first placed his handgun in his vehicle.  See First Amended Complaint ¶ 29, at 5.  Rosales then placed his handgun in the car.  See First Amended Complaint ¶ 30, at 5. At that point, Bradshaw exited his pickup truck, wearing a long sleeve t-shirt, shorts, and flip flops. See First Amended Complaint ¶ 31, at 5.  None of Bradshaw's clothing displayed CCSO insignia. See First Amended Complaint ¶ 31, at 5.  Bradshaw asked for Rosales' license.  See First Amended

Complaint ¶ 32, at 5.  Bradshaw also asked Rosales if he had been drinking.  See First Amended Complaint ¶ 32, at 5.  Rosales stated that he does not drink.  See First Amended Complaint ¶ 32, at 5.  Bradshaw continued to yell at Rosales.  See First Amended Complaint ¶ 32, at 5.

Soon after Bradshaw exited his vehicle, Chavez arrived at Rosales' residence.  See First Amended Complaint ¶ 33, at 5.  Chavez told Rosales that he could come over to her and told Bradshaw that he could leave.  See First Amended Complaint ¶ 33, at 5.  Before Bradshaw left, Rosales said: "[L]et's talk human being to human being."  See First Amended Complaint ¶ 34, at 6.  Bradshaw responded: "I'll talk to you in court when you get your citation in the mail."  See First Amended Complaint ¶ 35, at 6.  Bradshaw then drove away.  See First Amended Complaint ¶ 36, at 6.  Rosales told Chavez that Bradshaw had pointed a gun at him.  See First Amended Complaint ¶ 37, at 6.  Chavez described Bradshaw's behavior as highly irritated, gave Rosales back his license, and told him that he would not be getting a citation from her.  See First Amended Complaint ¶¶ 36, 38, at 6.  Rosales never received a citation from Bradshaw.  See First Amended Complaint ¶ 39, at 6.  A neighbor's video security camera recorded the confrontation between Bradshaw and Rosales.  See First Amended Complaint ¶ 40, at 6.  Later, the CCSO fired Bradshaw, and Bradshaw was charged and convicted of aggravated assault and third-degree child endangerment.  See First Amended Complaint ¶¶ 45-46, at 7.

## PROCEDURAL HISTORY

On July 24, 2020, Defendant Britt Snyder[2] filed a Notice of Removal.  See Notice of Removal, filed July 24, 2020 (Doc. 1).  In the First Amended Complaint, Rosales asserts two counts against Bradshaw under the Fourth and Fourteenth Amendments to the United States

---

[2]On September 22, 2020, the Court, on Snyder's motion, dismissed Snyder.  See Order on Defendant Snyder's Motion to Dismiss Under Rule 12 and Request for Qualified Immunity and Plaintiff's Motion for Leave for Time to File Response to Motion to Dismiss, filed September 22, 2020 (Doc. 32).

Constitution, 42 U.S.C. §§ 1983 and 1988, and the New Mexico Tort Claims Act ("NMTCA"), N.M.S.A. §§ 41-4-1 to -27.  See First Amended Complaint ¶¶ 60-68, at 1, 9-10 (no paragraph numbering on the first page).  For Count I, Rosales asserts that Bradshaw violated his Fourth Amendment right "to be free from excessive and unnecessary use of force."   First Amended Complaint ¶ 61, at 9.  Rosales alleges that Bradshaw "used . . . excessive, unnecessary, and unlawful [force] under the circumstances," and "was not justified or privileged under clearly established law and constituted an unreasonable seizure under the Fourth Amendment."  First Amended Complaint ¶¶ 62-63, at 9.  Rosales asserts:

> because Bradshaw could not have reasonably believed that Rosales posed a threat to his safety or the safety of others or that Rosales was resisting arrest or attempting to flee, Bradshaw's use of force violated Rosales' clearly established Fourth Amendment rights.  Snyder's failure to supervise, train and discipline coupled with Bradshaw's anger management issues, which were known, was a cause of the injuries to Rosales.

First Amended Complaint ¶ 64, at 9.  For Count II, Rosales alleges that "Bradshaw's excessive and unnecessary use of force against . . . Rosales constituted assault and battery under New Mexico common law," and at minimum were negligent.   First Amended Complaint ¶¶ 66-67, at 10. Rosales requests compensatory damages, punitive damages, attorneys' fees, costs, and prejudgment interest.  See First Amended Complaint at 10 (not paragraph numbering).  Bradshaw answered on July 31, 2020.  See Answer to First Amended Complaint at 1, filed July 31, 2020 (Doc. 10).

### 1.     The Motion to Intervene.

On July 27, 2020, Chaves County moved to intervene under rule 24 of the Federal Rules of Civil Procedure.  See County's Opposed Motion to Intervene, filed July 27, 2020 (Doc. 5)("Motion to Intervene").  Chaves County explains that it is a "governmental entity" protected by sovereign immunity, and that it has duties and obligations under the NMTCA.  See Motion to

Intervene ¶ 8, at 3 (citing N.M.S.A. §§ 41-4-3(B), (C)).  Chaves County states that Rosales alleges that Bradshaw was employed by Chaves County as a Sheriff's Deputy, that Bradshaw was a "public employee" and "law enforcement officer" under the NMTCA, and that Bradshaw was acting under color of law and in the course and scope of his employment.  See Motion to Intervene ¶ 5, at 2.  Chaves County maintains that its duties include paying any judgment or settlement of claims based on the commission of a tort or any violation of 42 U.S.C. § 1983 by a "public employee" of Chaves County, such as a Sheriff's Deputy, acting within the scope of his or her duty.  See Motion to Intervene ¶¶ 8-10, at 3-4 (citing N.M.S.A. §§ 41-4-3(G), -4(D), -20(A)(2), -23).  Chaves County argues that if the allegations against Bradshaw are true, those acts "arguably were outside the course and scope of his employment and outside the scope of his duties, within the definition and the meaning of the New Mexico Tort Claims Act," and Chaves County would not have to pay any judgment or settlement entered against Bradshaw.  Motion to Intervene ¶ 11, at 4.

Chaves County argues it has a right to intervene under rule 24(a), because Rosales' and Bradshaw's "interests are actually to the contrary" of Chaves County, because both parties intend to "argue that Defendant Bradshaw's acts were within his scope of duties, and that the County should and must pay any judgment entered against him."  Motion to Intervene ¶ 13, at 5 (citing Fed. R. Civ. P. 24(a)(2)).  Chaves County asserts that it has the right to argue that neither it nor its insurers have an obligation to pay any settlement or final judgment that might be entered against Bradshaw for the acts alleged in the First Amended Complaint.  See Motion to Intervene ¶ 12, at 4.  Chaves County asserts that a motion to intervene has never been denied under similar circumstances in the United States District Court for the District of New Mexico.  See Motion to Intervene ¶ 14, at 5.

In the alternative, Chaves County argues that the Court should permit it to intervene under rule 24(b)(1)(B), because it has a claim "that shares with the main action a common question of law or fact," because "the facts that are material to its claim are identical to many of the facts material to Plaintiff's substantive claims and, on information and belief, to some of the Defendant's defenses; and the law applicable to Plaintiff's claims for relief, too, shares a substantial nucleus of commonality."  Motion to Intervene ¶ 15, at 5-6.  Chaves County argues: (i) intervention will not cause a substantial delay because the case "is in its early stages"; and (ii) Chaves County will be prejudiced if it is not allowed to intervene because "the Court and/or jury may determine material facts that may become binding on Chaves County notwithstanding its lack of participation, based on principles of collateral estoppel."  Motion to Intervene ¶ 16, at 6.

### 2.     The Response to the Motion to Intervene.

Bradshaw responds to the Motion to Intervene.  See Response to County's Proposed Motion to Intervene, filed August 10, 2020 (Doc. 15)("Response Motion to Intervene").  Bradshaw argues that the Court should deny Chaves County's Motion to Intervene, because

> Sheriff of Chaves County, Britt Snyder, is sued in his individual and in his official capacity.  A suit against the Sheriff in his official capacity is a claim against the County itself.  See Kentucky v. Graham, 473 U.S. 159 (1985).  As such, the County's interests are not impaired and the County is adequately represented.

Response Motion to Intervene at 1.  Bradshaw acknowledges that, although Snyder is no longer Sheriff, rule 25 "provides for automatic substitution. 'An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.'"  Response Motion to Intervene at 1 n.1 (quoting Fed. R. Civ. P. 25(d)).  Bradshaw argues that Snyder provides adequate affirmative defenses, because "Snyder asserts that Defendant Bradshaw was not acting within the scope and course of his employment, nor was he a 'state actor.'"  Response Motion to

Intervene at 2.

3.     **The Reply to the Motion to Intervene.**

Chaves County replies.  <u>See</u> Reply in Support of County's Opposed Motion to Intervene, filed August 24, 2020 (Doc. 18)("MTI Reply").  Chaves County argues that it is "likely that all claims against Sheriff Britt Snyder, including the official-capacity claims, ultimately will be dismissed with prejudice, thereby making Defendant Bradshaw's arguments in opposition to intervention moot."  MTI Reply at 3.  Further, "[i]f the Board of County Commissioners is ever made a party to this civil action in some other, different capacity, the Court can fashion an appropriate remedy at that time to obviate duplicitous representation."  MTI Reply at 3.

4.     **The Motion to Dismiss.**

Bradshaw filed the MTD, arguing that he is entitled to qualified immunity.  <u>See</u> MTD at 3-4.  First, Bradshaw argues that his conduct does not violate the Fourth Amendment under <u>Holland v. Harrington</u>, 268 F.3d 1179, 1193 (10th Cir. 2001)("<u>Holland</u>").   <u>See</u> MTD at 4-5. Bradshaw recognizes that, although under <u>Holland</u>, "'it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, . . . here, the allegations are not analogous to <u>Holland</u>. Plaintiff is an adult, not a child."  MTD at 4 (quoting <u>Holland</u>, 268 F.3d at 1193). Bradshaw argues that there is no clearly established law, because "[i]n general, Courts do not find constitutional violations for pointing a firearm when there is a reasonable threat of danger or violence to police."  MTD at 5.  Bradshaw argues:

> Mr. Bradshaw identified himself as a law enforcement officer after seeing Plaintiff emerge from his vehicle with a weapon.  Mr. Bradshaw allegedly pointed his firearm at Plaintiff and told Plaintiff to put the gun back in his vehicle.  Plaintiff complied and returned.  However, once the situation was under control, and the need for Mr. Bradshaw's weapon obviated, there are no further allegations that Mr. Bradshaw trained his weapon on Plaintiff.  Assuming the allegations are true, Mr. Bradshaw is entitled to qualified immunity.

MTD at 5.

Second, Bradshaw argues that he did not commit either assault or battery, because Bradshaw's conduct did not violate the Fourth Amendment:

> Put another way, it was not unreasonable under the Fourth Amendment for Mr. Bradshaw to train his weapon on Plaintiff, who had approached Mr. Bradshaw's vehicle with a firearm. There simply isn't any authority for the proposition that a different standard would apply to a law enforcement officer under State tort law.

MTD at 6. Accordingly, Bradshaw requests that the Court grant the MTD. See MTD at 6.

### 5.     The September 8, 2020, Hearing.

At the September 8, 2020, hearing, Chaves County argued that the Court should grant its MTI either as intervention of right under rule 24(a) of the Federal Rules of Civil Procedure or permissive intervention under rule 24(b). See Draft Transcript of Hearing at 3:24-4:17 (taken September 8, 2020)(Dickman)("Sept. 8 Tr.").[3] Rosales stated that he did not oppose the MTI. See Sept. 8 Tr. at 18:10-19:2 (Newell).

The Court asked:

> Well . . . I think I've had one of Mr. Huss' motions before about [needing] to name the county commissioners, I think, rather than naming the county or naming the police department, or sheriff's office, so if I grant that motion are you going to then name the county commissioners as your defendant if we dismiss the claim against the sheriff in his official capacity

Sept. 8 Tr. at 19:3-10 (Court). Rosales stated he would look into the issue. See Sept. 8 Tr. at 19:11-24 (Newell). Bradshaw stated that he opposed the MTI, because "there is in our case a party who is prepared to advance the exact position that the proposed intervenor seeks to litigate in this case . . . . [And] I don't dispute that the County has an interest. They certainly do. It's an interest that's been acknowledged before by this Court." Sept. 8 Tr. at 21:3-22:2 (Macke). Bradshaw

---

[3]The Court's citations to the three transcripts of the hearings refer to the court reporter's original, unedited versions. Any final transcript may contain slightly different page and/or line numbers.

stated that there is not a conflict with the sheriff, because

> [t]he sheriff could certainly argue that Mr. Bradshaw, to whom the plaintiff is seeking to hold liable was not acting within the scope of his duties or under color of law, while at the same time arguing that his own conduct was within the scope of his duties and under color of law.  I don't know that there is a conflict.

Sept. 8 Tr. at 22:8-15 (Macke).

The Court predicted that

> the claim against the sheriff is in his official capacity is going to be dismissed, and then [Rosales] has a choice then of bringing the county in or not bringing the county in, just letting that Monell [v. Dep't of Soc. Servs., 436 U.S. 658 (1978)] claim go, and at that point there would be nobody in the case that would be representing the county's interests and asserting this issue, right.

Sept. 8 Tr. at 24:21-25:3 (Court).  Bradshaw agreed, and the Court stated that "it's probably inevitable that [Chaves County is] going to be in this case and in one form or another at a particular time."  Sept. 8 Tr. at 25:4-15 (Macke, Court).  The Court concluded the hearing:

> Well, I'm going to grant the motion [to intervene].  I think -- I don't think there is a party presently in the case that can adequately represent . . . .  [M]y prediction is that [Sheriff] Snyder is not going to be in this case because at least in an official capacity if at this time is a Monell type of claim, then it would seem to me it's going to be the current sheriff or the board of county commissioners, the county if it's a Monell claim.  If we're saying that he personally was involved in the civil rights violation, then it sounds to me like that's an individual claim, so I think Snyder is probably coming out in his official capacity.  That would be my prediction . . . .  [I]t's up to [Rosales] whether the county should come in or not if they come in then we're right back here with the county in and if he doesn't bring them, then the county needs to come in and be able to pursue it.  So it seems to me the County is going to be in this case in one form or another and so I should go ahead and grant the motion to intervene and let them in the case early and proceed.  So I'll grant the motion and allow [Chaves County] to come into the case at the earliest possible time, and be involved in all the proceedings.

Sept. 8 Tr. at 29:2-30:1 (Court).

**6.**   **The September 14, 2020, Hearing.**

At the September 14, 2020, hearing, the Court asked whether any of the parties opposed Rosales' motion for leave to file a response.  See Draft Transcript of Hearing at 3:25-4:14 (taken

September 14, 2020)(Court)("Sept. 14 Tr.").  Bradshaw stated he did not, Chaves County stated

that it did not have a position, and Snyder stated that he had filed a Response in opposition.  See

Sept. 14 Tr. at 4:18-5:4  (Court, Dickman, Macke, Huss).  The Court stated:

> [T]he problem is[,] and I know these are motions to dismiss[, b]ut we know in the
> motion for summary judgment, the [United States Court of Appeals for the] Tenth
> Circuit frowns on granting motions for summary judgment on a default basis.  They
> still make us look at it . . . .  I understand the good cause standards.  I just think
> there is a tension between what the Tenth Circuit tells us on good cause and then
> what they tell us on motions for summary judgment.  Don't default a party and not
> consider the merits . . . .  I don't know how you reconcile them but[,] in any case[,]
> I guess I'll figure out what to do on the motion itself.  But chances are I'm going to
> consider the arguments therein before I make a ruling on the Motion to Dismiss
> under Rule 12.  So even if I don't grant the Motion, I'm going to probably consider
> the arguments in it.  And if anybody wants to file a reply, they're welcome to do,
> so I think the defendants are entitled to that if they wish to have it.

Sept. 14 Tr. at 6:5-7:2 (Court).

After Snyder argued that he should be dismissed, Rosales agreed that "I think at this time

that's an appropriate motion.  It's clear Sheriff Snyder is no longer the sheriff."  Sept. 14 Tr. at

17:13-16 (Newell).  The Court stated: "All right.  I wonder if the most appropriate thing to do here

would be just to have [Snyder] prepare a form of order granting this motion and everybody sign

off on it as to at least form."  Sept. 14 Tr. at 17:17-21 (Court).  The parties then agreed with the

Court that "it would be better now for the record's sake that" Rosales' motion for leave to file his

response is granted as well.  Sept. 14 Tr. at 17:24-18:11 (Court, Huss, Newell).

**7.      The Response to the Motion to Dismiss.**

Rosales responds to the MTD, arguing: (i) that Bradshaw is not entitled to qualified

immunity, because Bradshaw violated his Fourth Amendment rights; and (ii) that his New Mexico

state law claims should not be dismissed, because Bradshaw was acting within the scope of his

duties.  See Plaintiff's Response to Defendant David Bradshaw's Motion to Dismiss, at 6-7, 10,

filed September 8, 2020 (Doc. 25)("Response to MTD").  First, Rosales contends that Bradshaw's

actions were not objectively reasonable under the Fourth Amendment, because

> it is clear that following Plaintiff to his residence in a personal vehicle while off
> duty, blocking his driveway, verbally abusing him and threatening him and
> ultimately pointing a revolver at him in a manner in which Plaintiff feared for his
> life is far from reasonable.  Bradshaw's reaction to being cut off, which is not a
> crime, did not justify his irrational and threatening actions.  No reasonable officer
> would have acted in such a manner.  Even . . . Deputy Chavez . . . indicated that
> Defendant Bradshaw's actions were not reasonable under the circumstances . . . .
> It is clear that Bradshaw knew or should have known that his actions were not
> reasonable.  They weren't even reasonable to a deputy in the same sheriff's
> department.

Response to MTD at 7-8 (citing First Amended Complaint ¶¶ 40-44, at 6-7).  Rosales argues that

he was never a threat to Bradshaw, because he "complied with the open carry laws of the state of

New Mexico.  The only times he touched his firearm was to put it in his pocket when exiting his

vehicle and to put it back inside his vehicle at the direction of Bradshaw."  Response to MTD at 9.

Second, Rosales argues that New Mexico law waives sovereign immunity under the

Eleventh Amendment to the Constitution of the Unites States when officers are acting within the

scope of their duties.  See Response to MTD at 10 (citing N.M.S.A. § 41-4-12).  Rosales argues

that this waiver of immunity includes intentional torts, and that the "well pled facts show Bradshaw

was convicted of aggravated assault."  Response to MTD at 10.  Rosales contends that there is a

four-part test to determine whether employees were acting within the scope of their duties for

intentional torts:

> "an employee's action, although unauthorized, is considered to be in the scope of
> employment if the action (1) is the kind the employee is employed to perform; (2)
> occurs during a period reasonably connected to the authorized employment period;
> (3) occurs in an area reasonably close to the authorized area, and (4) is actuated, at
> least in part, by a purpose to serve the employer."

Response to MTD at 10 (quoting Narney v. Daniels, 1992-NMCA-133, ¶ 34, 115 N.M. 41, 49,

846 P.2d 347, 355).  Rosales argues that Bradshaw's actions satisfy all four elements because:

> Bradshaw attempted to perform a []stop[] for perceived violations of traffic control
> law, the action occurred while Bradshaw was employed as a deputy for the Chaves

> County Sheriff's Office, it occurred in Chaves County where Bradshaw performed his duties, and it was actuated, in part, to serve the interest of his employer by enforcing traffic laws in Chaves County.

Response to MTD at 10-11.

### 8.       The Reply to the MTD.

Bradshaw replies to the MTD.  See Defendant David Bradshaw's Reply to Motion to Dismiss on the Basis of Qualified Immunity and on Other Grounds, filed September 17, 2020 (Doc. 29)("MTD Reply").  Bradshaw argues that he did not violate the Fourth Amendment when he "rais[ed] a weapon at Plaintiff, who approached Officer Bradshaw with a weapon," and that Rosales does not cite any law that Bradshaw violated that clearly establishes Rosales' constitutional right.  MTD Reply at 1.  Bradshaw argues that his conduct is reasonable and is distinguishable from Holland, 268 F.3d at 1193, because

> at the time Officer Bradshaw allegedly identifies himself as a law enforcement officer, and points his weapon, Plaintiff is armed with a firearm of his own and is walking toward Officer Bradshaw.  First Amended Complaint ¶¶ 22-24.  In other words, the statement of law from the case is significant because it distinguishes Officer Bradshaw's conduct from that which "may" be excessive, i.e. (1) after a person has submitted to a show of authority without resistance; (2) when an officer has no reasonable cause to believe that the person poses a danger to the officer; and (3) thereafter, the "continued" aiming of a loaded firearm at that person.
>
> The distinguishing factors here, of course, are that Plaintiff was armed; had not submitted to any authority before the weapon was drawn; and there is no allegation that the weapon had "continued" to be trained on Plaintiff.  Cf. Thomas v. Durastanti, 607 F.3d 655, 669 (10th Cir. 2020)("While Holland clearly states that the display of weapons should be predicated on a perceived risk of danger based on what an officer knows at the time, none of the risks or concerns identified by Agent Durastanti had been obviated when his weapon was displayed.").  These distinctions alone justify a grant of qualified immunity.

MTD Reply at 3.  Bradshaw argues that the fact that he was off duty does not change the analysis because, under New Mexico law, "'all sheriffs shall at all times be considered as in the discharge of their duties and be allowed to carry arms on their persons.'"  MTD Reply at 3 (quoting N.M.S.A. § 4-41-10, and citing 1966 Op. Att'y Gen. No. 66-91 ("Under the provisions of Section 15-40-12,

N.M.S.A., 1953 Compilation, all sheriffs are on duty at all times.")).  Bradshaw also points to N.M.S.A. § 29-1-1, which "imposes an obligation and potential liability upon law enforcement officers for their failure to investigate crimes of which they are aware."  MTD Reply at 4 (citing N.M.S.A. § 29-1-1 ("It is hereby declared to be the duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer or of which he is aware . . . .")).

Bradshaw argues that it was reasonable for him to feel threatened, because Rosales exited his vehicle armed and walked toward Bradshaw.  See MTD Reply at 4.  Bradshaw contends that he

> could reasonably, if mistakenly, perceive a risk or fear his own safety based on the knowledge that Plaintiff had cut him off in traffic, made conscious attempts to distance himself in his vehicle, exited his vehicle armed with a weapon and then began approaching Officer Bradshaw's vehicle, which was parked on the street.

MTD Reply at 5 (citing United States v. Hensley, 469 U.S. 221, 235 (1985), Thompson v. Rahr, 885 F.3d 582 (9th Cir. 2018), Howard v. Kansas City Police Dep't, 570 F.3d 984, 989 (8th Cir. 2009), Collins v. Nagle, 892 F.2d 489, 495-97 (6th Cir. 1989), Hinojosa v. City of Terrell, Tex., 834 F.2d 1223, 1229 (5th Cir. 1988), and Sharrar v. Felsing, 128 F.3d 810, 822 (3rd Cir. 1997)).  Bradshaw argues that the fact that he "did not 'continue' to aim his weapon at Plaintiff who, at the time the weapon was displayed, was armed and walking toward Officer Bradshaw . . . [is a] critical distinguishing circumstance[] that warrant[s] a grant of qualified immunity."  MTD Reply at 7 (quoting Holland, 268 F.3d at 1193).

Next, Bradshaw agrees with Rosales that he was acting within the scope of his duties, because he "called a fellow deputy during the incident and displayed his badge, all indices of his actions being well within the scope of his duties."  MTD Reply at 7.  Bradshaw also agrees with Rosales that N.M.S.A. § 41-4-12 waives sovereign immunity for the claims of assault and battery.

See MTD Reply at 8.  Bradshaw maintains, however, that "there are no allegations that Officer

Bradshaw's conduct was unreasonable."  MTD Reply at 8.  Bradshaw argues that, if his conduct

is not "unreasonable under the Fourth Amendment, then the state tort claim, which also applies a

reasonableness standard, must also be dismissed and for the same reason."  MTD Reply at 8

(footnote omitted).  Bradshaw, however,

> acknowledges that he was convicted of aggravated assault. In determining the
> preclusive effect of prior determinations in state judicial proceedings, a federal
> court must apply state law.  See Pittsburg County Rural Water Dist. No. 7. v. City
> of McAlester, 346 F.3d 1260, 1273 (10th Cir. 2003).  The Supreme Court of New
> Mexico has held that "absent a plea of guilty, proof of conviction of criminal
> charges is inadmissible in the trial of a subsequent civil action for tort arising out
> of the same act."  New Mexico Physicians Mut. Liability Co. v. LaMure, 116 N.M.
> 92, 100, 860 P.2d 734, 742 (1993)(quoting Gray v. Grayson, 76 N.M. 255, 256, 414
> P.2d 228, 229 (1966)).

MTD Reply at 8 n.1.

## 9.    The September 23, 2020, Hearing.

The Court held a hearing on the MTD.  See Draft Transcript of Hearing (taken September

23, 2020)("Sept. 23 Tr.").  Bradshaw argued that the state law claim is "contingen[t] upon the

Court's treatment of the Fourth Amendment."  Sept. 23 Tr. at 3:19-21 (Macke).  Bradshaw argued

that none of the three Holland factors favor Rosales.  See Sept. 23 Tr. at 5:20-6:7 (Macke).

Bradshaw argued that, first, "at the time Mr. Bradshaw identifies himself and points his weapon

the plaintiff is approaching him with a weapon.  So under that first element under Holland,

Mr. Rosales has not submitted, he's not restrained."  Sept. 23 Tr. at 6:8-12 (Macke).  The Court

asked, if Bradshaw is a police officer investigating a crime, here reckless driving, then "didn't the

restraint occur as soon as [Bradshaw] . . . block[ed] the driveway of Mr. Rosales" with his vehicle?

Sept. 23 Tr. at 6:25-7:2 (Court).  Bradshaw agreed that

> arguably the restraint did [occur then and] . . . I think at the very least you have an
> investigative detention or a Terry stop at the point Mr. Bradshaw pulls up and
> blocks the driveway. . . . I think that the focus point of the complaint appears to me

> to be the pointing of the weapon at in Rosales and I don't know that the act of
> parking a vehicle on a street outside someone's driveway would rise to the level of
> the Fourth Amendment violation either.  But again I'm assuming that there is some
> nature of a restraint or a seizure here.  The issue is whether the show of force is
> excessive.  That's the focus of the briefing.

Sept. 23 Tr. at 7:3-9:1 (Macke).

> Turning to the second factor, Bradshaw argued that

> at the time Mr. Bradshaw identifies and aims his firearm at Mr. Rosales
> Mr. Rosales is approaching him with a weapon.  Again this isn't a situation where
> the officer no longer has a reasonable perception of a risk.  The risk is still there . . . .
> I think Mr. Bradshaw did have reasonable cause to perceive a risk given that there
> is an unknown, unrestrained and armed suspect approaching his vehicle.

Sept. 23 Tr. at 6:13-18 (Macke); id. at 9:6-10 (Macke).  Third,

> Mr. Bradshaw did not continue, at least it not alleged, . . . aiming his weapon at the
> plaintiff.  In fact once the plaintiff responds to Mr. Bradshaw[] . . . and puts the gun
> back in the vehicle, there doesn't appear to be any additional show of force and
> certainly not an application of force after that point. . . .  Certainly what happened
> here is there was just enough force to get . . . Rosales to put his own weapon
> away . . . .  [F]acts [exist] that I don't think are relevant to the excessive force
> claim. . . .  I think brevity matters here.

Sept. 23 Tr. at 9:11-23 (Macke); id. at 10:21-22 (Macke).  Bradshaw then argued Bradshaw did

not violate Rosales clearly established constitutional rights:

> So we're not asking for the Court to look at identical case or similar factual
> similarities, this one is clearly not analogous . . . to the Holland case it's clearly
> distinguishable.  He's not restrained, he's armed and he's basically an unknown
> commodity.  He's in relatively close proximity to Mr. Bradshaw, and again the
> display of force was brief . . . .  I don't believe the law was clearly established to
> say that it was obvious to a law enforcement officer that briefly pointing a weapon
> at an unrestrained suspect who was armed would violate the Fourth Amendment.
> We'd ask the Court to find that Mr. Bradshaw is entitled to qualified immunity.

Sept. 23 Tr. at 11:2-22 (Macke).

Next, the Court asked Chaves County whether it agreed with Bradshaw's MTD, and

Chaves County responded that it did not have a position, but that "in general," it agreed with the

argument, because if the Court granted the MTD, intervention would be moot. Sept. 23 Tr. at 14:1-

10 (Court, Dickman).   The Court asked whether Chaves County "agreed with [Bradshaw] that

there is state action here," and whether there is any different between state action and the scope of

duties inquiry.   Sept. 23 Tr. at 14:11-13 (Court).   Chaves County answered that it

> agree[s] [state action has] been alleged.   Your Honor, I believe accepting the
> allegation of the complaint, the well plead allegation of the complaint is true for
> purpose of the motion [to dismiss.]
>
> . . .
>
> There are two different issues there is obviously some overlap and there have been
> cases, this has been actually the subject of several decisions in the district of New
> Mexico.   But I believe the consensus has been that they are different issues with
> obviously some overlap.   One can be acting under color of state law, and still be
> acting outside the scope of one's duty.

Sept. 23 Tr. at 14:14-15:6 (Dickman).   Chaves County agreed that the Court should assume state

action, because it does not implicate whether an employee is acting within the scope of their duties:

"One could be acting under color of state law and still not be acting within the scope of duties

when one looks at the definition in the Tort Claims Act of scope of duties is something that was

required requested or authorized."   Sept. 23 Tr. at 15:16-21 (Dickman).

   Next, Rosales argued against the MTD, and emphasized the fact that Bradshaw went to

trial and was convicted under state law for this exact situation.   See Sept. 23 Tr. at 18:24-19:23

(Newell).   Rosales disagreed with the Court that the "fact that [Bradshaw] violated state law is

irrelevant to the Fourth Amendment analysis."   Sept. 23 Tr. at 19:24-20:10 (Court, Newell).   The

Court stated that a jury would never hear of the state conviction, "unless there is something about

the state criminal proceedings that give us preclusive effect as to some of the issues."   Sept. 23 Tr.

at 20:23-25 (Court).

   Rosales then argued that Bradshaw was acting as a police officer, because Bradshaw called

another deputy to run the license plate and get Rosales' address, which is something that "only law

enforcement can do."   Sept. 23 Tr. at 22:3-12 (Newell).   The Court asked whether it should ignore

the fact that Bradshaw was off duty and had a child with him at the time.  See Sept. 23 Tr. at 23:3-8 (Court).  Rosales argued that the Court should consider these facts, but considering all the facts, Bradshaw was acting as a police officer, because (i) Bradshaw called in Rosales' license plate; (ii) Bradshaw had another officer look up Rosales address; (iii) Bradshaw followed Rosales; (iv) Bradshaw pulled in behind Rosales at Rosales' house; (v) Bradshaw identified himself as a law enforcement officer; and (vi) Bradshaw told Rosales that Rosales was violating the laws and was going to get a ticket.  See Sept. 23 Tr. at 23:16-24:13 (Newell).  Rosales argued that the excessive force began when Bradshaw pulled in behind Rosales, which constituted a seizure under the Fourth Amendment, because Rosales is no longer free to leave.  See Sept. 23 Tr. at 24:23-25 (Newell).  Rosales argued:

> I think at the point in time where he brandished his weapon and pointed it at my client that's when the criminal laws were violated and that's when the constitutional analysis really kicks in in terms of whether it was reasonable or not.  I mean I would submit the whole pulling in behind my guy to block him wasn't reasonable because he could have easily pulled up and parked on the curb and didn't block my guy in.  But even beyond that when he  started then blocking him in and then pointed his weapon at him.  These are all things that were beyond what was necessary, what was appropriate.  And I  submit what was reasonable.

Sept. 23 Tr. at 26:6-18 (Newell).  The Court asked whether it is reasonable for a police officer to draw his firearm if he sees that a suspect is armed.  See Sept. 23 Tr. at 26:19-25 (Court).  Rosales argued that it is contextual, and that Rosales

> was exercising his lawful constitutional rights in a manner that our state recognizes. . . . So whenever somebody is brandishing an open carry in New Mexico, does law enforcement always drawdown on them[?  N]o. [D]o they even most of the time drawdown on them[?  N]o.  Would a reasonable officer draw down on someone when they're not being threatened[?  N]o.  That's where it comes down to.  My guy wasn't doing anything other than what the law allows.  And Bradshaw pointed a gun at him.  That's not reasonable. . . . A law enforcement officer pointing a loaded gun at somebody is a real deal.

Sept. 23 Tr. at 27:8-28:10 (Newell).

Chaves County replied, pointing out that Rosales started to walk towards Bradshaw, "[h]e wasn't just standing there when [Bradshaw] pulled the gun, [Rosales] was walking toward him," and that under "U.S. Supreme Court law [and] Tenth Circuit law, [a] violation of state law can't be the basis for a 1983 claim.  I mean that's just axiomatic."  Sept. 23 Tr. at 33:22-34:3 (Dickman).

      **10.**    **Order Dismissing Snyder.**

On September 22, 2020, the Court dismissed Snyder.  <u>See</u> Order on Defendant Snyder's Motion to Dismiss Under Rule 12 and Request for Qualified Immunity and Plaintiff's Motion for Leave for Time to File Response to Motion to Dismiss, filed September 22, 2020 (Doc. 32)("Snyder Order").

      **11.**    **The Order.**

On March 31, 2021, the Court entered an Order, which: (i) granted the Motion to Intervene; and (ii) granted with respect to the federal issues and denying with respect to the state law issues the MTD.  <u>See</u> Order at 1-2, filed March 31, 2021 (Doc. 41)("March 31 Order").  The Court explains that "[t]his Order is an interlocutory order, and is not yet subject to appeal," and that it "will issue a Memorandum Opinion at a later date fully detailing its rationale for its decision."  March 31 Order at 1 n.1.  The Court first concludes that "Chaves County is permitted to intervene for the reasons stated on the record" at the September 8, 2020 hearing.  March 31 Order at 2.  Second, the Court concludes that "Bradshaw acted under color of law."  March 31 Order at 2.  Third, the Court concludes that "Bradshaw is entitled to qualified immunity, because (a) although Bradshaw's use of force was objectively unreasonable, (b) Bradshaw did not violate Rosales' clearly established rights, because Rosales was armed when Bradshaw seized him."  March 31 Order at 2.  Last, the Court concludes that "it will remand this case, and the remaining state law

claims of assault and battery, to Chaves County, Fifth Judicial District Court, New Mexico, because there are no remaining federal issues before the Court."  March 31 Order at 2.

## **LAW REGARDING INTERVENTION AS A MATTER OF RIGHT**

Federal Rule of Civil Procedure 24(a) provides for intervention as a right:

(a)      **Intervention of Right**.  On timely motion, the court must permit anyone to intervene who:

    (1)      is given an unconditional right to intervene by a federal statute; or

    (2)      claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a) (bold in original).  The movant bears the burden of establishing its right to intervene.  See United States v. Tex. E. Transmission Corp., 923 F.2d 410, 414 (5th Cir. 1991).  A court generally may not consider concerns of judicial economy and efficiency when ruling on a request to intervene as a right.  See United States v. Union Elec. Co., 64 F.3d 1152, 1158 & n.1 (8th Cir. 1995)("We find that supplanting the standards applicable to intervention as of right under Rule 24(a) with policy considerations led to the erroneous denial of intervention in this case."); In re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991)("The district court, however, incorrectly bolstered its denial of intervention of right by referring to concerns of judicial economy and need for guidance.  Although those issues have a place in motions for permissive intervention, Rule 24(a) affords them no weight.").  To intervene as a matter of right under rule 24(a)(2), the movant must show that: (i) the motion is timely; (ii) the movant asserts an interest relating to the property or transaction which is the subject of the action; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) existing parties do not adequately represent the movant's interest.  See Elliott Indus. LP v. Am. Prod. Co., 407 F.3d at 1103.

"'[T]he timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances.'" Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. 236, 245 (D.N.M. 2008)(Browning, J.)(quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d 1246, 1250 (10th Cir. 2001)). "Unusual circumstances" refers to those circumstances that would excuse the untimely filing of a motion to intervene. In re SEC, 296 F. App'x 637, 640 (10th Cir. 2008)(unpublished).[4] In measuring timeliness by the length of time that the applicant knew of its interest, the United States Court of Appeals for the Tenth Circuit looks to the point in time "when the movant was on notice that its interests may not be protected by a party already in the case." Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d 1223, 1232 (10th Cir. 2010).

---

[4]In re SEC is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that In re SEC; Ute Distrib. Corp. v. Norton, 43 F. App'x 272 (10th Cir. 2002); Leo v. Garmin Intern., Inc., 464 F. App'x 737 (10th Cir. 2012); Lobozzo v. Colorado Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011); Bates v. Schwarzenegger, 832 F. App'x 509 (9th Cir. 2020); Landry v. Laborde-Lahoz, 852 F. App'x 123 (5th Cir. 2021); Routt v. Howry, 835 F. App'x 379 (10th Cir. 2020); United States v. Alvarado, 154 F. App'x 730 (10th Cir. 2005); Grauerholz v. Adcock, 51 F. App'x 298 (10th Cir. 2002); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); Chidester v. Utah Cnty., 268 F. App'x 718 (10th Cir. 2008); In re Est. of Bleck ex rel. Churchill v. City of Alamosa, 643 F. App'x 754 (10th Cir. 2016); Ealum v. Schirard, 46 F. App'x 587 (10th Cir. 2002); and United States v. Alvarez, 61 F. App'x 120 (5th Cir. 2003), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion.

"Under rule 24(a)(2), the intervenors must 'claim . . . an interest relating to the property or transaction which is the subject of the action.'" Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1250. "The Tenth Circuit requires that the interest be 'direct, substantial, and legally protectable.'" Forest Guardians v. U.S. Dep't of Interior, No. CIV 02-1003, 2004 WL 3426413, at *5 (D.N.M. Jan. 12, 2004)(Browning, J.)(quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1250). The Tenth Circuit has also noted that the inquiry is "highly fact-specific," and that "the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1251-52. "The threshold for finding the requisite legal protectable interest is not high." Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *5 ("Furthermore, the Tenth Circuit has deemed the mere threat of economic injury to be sufficient for granting intervention.") (citing Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d 1111, 1115 (10th Cir. 2002)).

"To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." WildEarth Guardians v. U.S. Forest Serv., 573 F.3d 992, 995 (10th Cir. 2009)("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."). "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." San Juan Cnty. v. United States, 503 F.3d 1163, 1203 (10th Cir. 2007). A third party's interest may be impaired "when the resolution of the legal questions in the case effectively foreclose the rights of the intervenor in later proceedings, whether through res judicata, collateral estoppel, or stare decisis." Ute Distrib. Corp. v. Norton, 43 F. App'x 272, 279 (10th Cir. 2002).

"Although an applicant for intervention as of right bears the burden of showing inadequate representation, that burden is the 'minimal' one of showing that representation 'may' be inadequate." Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *6. "The most common situation in which courts find representation adequate arise when the objective of the [movant] is identical to that of one of the parties." Bottoms v. Dresser Indus., Inc., 797 F.2d 869, 872-73 (10th Cir. 1986)(emphasis added). The Tenth Circuit has found, however, that the "possibility of divergence of interest need not be great in order to satisfy the burden of the applicants." Coal. of Ariz./N.M. Cntys. v. Dep't of Interior, 100 F.3d at 845. This minimal burden is further reduced when it is the government that is supposed to adequately represent the potential intervenor's interest. See Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1254-1255. "[A] presumption of adequate representation arises when an applicant for intervention and an existing party have the same ultimate objective in the litigation," but the Tenth Circuit has "held this presumption [is] rebutted by the fact that the public interest the government is obligated to represent may differ from the would-be-intervenor's particular interest." Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1255. The Tenth Circuit stated:

> [T]he government's representation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same posture in the litigation. In litigating on behalf of the general public, the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be intervenor.

Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1255-56. Thus, when a prospective intervenor shows that the "public interest the government is obligated to represent may differ from the would-be intervenor's particular interest," the burden of demonstrating inadequate representation is met. Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1255.

> [T]he Rule's reference to practical consideration in determining whether an applicant can intervene implies that those same considerations can justify

limitations on the scope of intervention.  If the applicant is granted intervention because of an interest that may be injured by the litigation, it does not follow that the intervention must extend to matters not affecting that interest; and just because no party will adequately represent one particular interest of the applicant does not mean that the applicant must be allowed to participate in the litigation of other matters concerning which its interests *are* adequately represented.

San Juan Cnty. v. United States, 503 F.3d at 1189 (emphasis in original).

## LAW REGARDING PERMISSIVE INTERVENTION

Rule 24(b) provides for permissive intervention:

(1)     **In General.**  On timely motion, the court may permit anyone to intervene who:

     (A)     is given a conditional right to intervene by a federal statute; or

     (B)     has a claim or defense that shares with the main action a common question of law or fact.

(2)     **By a Government Officer or Agency.**  On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

     (A)     a statute or executive order administered by the officer or agency; or

     (B)     any regulation, order, requirement, or agreement issued or made under the statute or executive order.

(3)     **Delay or Prejudice.**  In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24(b) (bold in original).  The movant bears the burden of establishing its right to intervene.  See United States v. Tex. E. Transmission Corp., 923 F.2d at 414.  "Unlike Rule 24(a), which governs mandatory intervention, Rule 24(b) specifically vests discretion in district courts to consider whether intervention will unduly delay or prejudice the adjudication of the rights of the original parties." James W. Moore, 6 Moore's Manual: Federal Practice and Procedure, § 24.10[1] (LEXIS 2021)(citation omitted).  Accord In re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991)("The

district court, however, incorrectly bolstered its denial of intervention of right by referring to concerns of judicial economy and need for guidance.  Although those issues have a place in motions for permissive intervention, Rule 24(a) affords them no weight.").  "The district court possesses broad discretion in determining whether to grant permissive intervention and will rarely be reversed on appeal."  6 Moore, supra, § 24.10[1].  "[C]onsiderations of trial convenience dominate the question of whether to allow permissive intervention."  6 Moore, supra, § 24.10[1].  Accord Garza v. Cnty. of L.A., 918 F.2d 763, 777 (9th Cir. 1990)("The decision to grant or deny [permissive] intervention is discretionary, subject to considerations of equity and judicial economy.").

"To permissively intervene, a party need not have a direct personal or pecuniary interest in the subject of the litigation."  San Juan Cnty. v. United States, 503 F.3d at 1207.  Permissive intervention lies in the court's sound discretion, and the appellate court will not disturb the district court's exercise of that discretion absent clear abuse.  See United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1427 (10th Cir. 1990).  The Court has previously stated:

> Rule 24(b) allows permissive intervention under the following conditions: (i) the application to intervene is timely; (ii) the applicant's claim or defense and the main action have a question of law or fact in common; and (iii) intervention will not unduly delay or prejudice the adjudication of the original parties' rights.

Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *10-11 (D.N.M. Jan. 12, 2004)(Browning, J.).  Rule 24(b)(3) requires the court to consider whether intervention will cause undue delay or prejudice when considering whether to grant permissive intervention.  See Fed. R. Civ. P. 24(b)(3); DeJulius v. New Eng. Health Care Emps. Pension Fund, 429 F.3d 935, 943 (10th Cir. 2005)(noting that district courts are required to consider undue prejudice or delay in deciding whether to grant permissive intervention); Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. at 259.  While not a required part of the test for permissive intervention, a court's

finding that existing parties adequately protect prospective intervenors' interests will support a denial of permissive intervention.  See City of Stilwell v. Ozarks Rural Elec. Coop. Corp., 79 F.3d 1038, 1043 (10th Cir. 1996).

"The timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." Am. Assoc. of People with Disabilities v. Herrera, 257 F.R.D. at 245 (quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1250).  "Unusual circumstances" refers to those circumstances that would excuse the untimely filing of a motion to intervene.  In re SEC, 296 F. App'x at 640.  In measuring timeliness by the length of time that the applicant knew of its interest, the Tenth Circuit looks to the time "when the movant was on notice that its interests may not be protected by a party already in the case." Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d at 1232.  Generally speaking, the timeliness requirement for permissive interventions is stricter than for intervention as of right. See 7C C. Wright & A. Miller, Federal Practice and Procedure § 1916, at 531 (3d ed. 2007)("Since in situations in which intervention is of right the would-be intervenor may be seriously harmed if intervention is denied, courts should be reluctant to dismiss such a request for intervention as untimely, even though they might deny the request if the intervention were merely permissive.").

**LAW REGARDING RES JUDICATA**

"Under res judicata . . . a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in the prior action." Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d 501, 503-04 (10th Cir. 2002). The general rule is that "[t]he appealability of a judgment . . . does not hinder its preclusive effect." MACTEC, Inc. v. Gorelick, 427 F.3d 821, 832 (10th Cir. 2005)(citing 18A Wright & Miller §

4433, at 78-85 (2d ed. 2002)).  Accord Leo v. Garmin Intern., Inc., 464 F. App'x 737, 740 (10th Cir. 2012)(unpublished)("[I]t does not matter that [the plaintiff's] first appeal had not been resolved at the time [he] filed his second suit because under the federal law of claim preclusion, the district court's order was final for res judicata purposes.").  Courts occasionally refer to the two different effects of judgments under the doctrine of res judicata with various and sometimes conflicting terminology.  See 18 Wright & Miller § 4402, at 7 ("The effects of former adjudication have been discussed and determined in varying and occasionally conflicting terminology.").  "[T]he broad 'res judicata' phrase refers to the distinctive effects of a judgment separately characterized as 'claim preclusion' and 'issue preclusion.'"  18 Wright & Miller § 4402, at 7.  The United States Court of Appeals for the Fifth Circuit has presented a summary that explains the two doctrines:

> The rules of res judicata, as the term is sometimes sweepingly used, actually comprise two doctrines concerning the preclusive effect of a prior adjudication. The first such doctrine is "claim preclusion," or true res judicata.  It treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action."  When the plaintiff obtains a judgment in his favor, his claim "merges" in the judgment; he may seek no further relief on that claim in a separate action.  Conversely, when a judgment is rendered for a defendant, the plaintiff's claim is extinguished; the judgment then acts as a "bar."  Under these rules of claim preclusion, the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial.  The aim of claim preclusion is thus to avoid multiple suits on identical entitlements or obligations between the same parties, accompanied, as they would be, by the redetermination of identical issues of duty and breach.
>
> The second doctrine, collateral estoppel or "issue preclusion," recognizes that suits addressed to particular claims may present issues relevant to suits on other claims.  In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties.  It is insufficient for the invocation of issue preclusion that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered.

Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc., 575 F.2d 530, 535-36 (5th Cir. 1978)(citations omitted).   The following principles apply in federal-question cases -- and are generally consistent with state-law res judicata rules -- but "[f]or judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." Taylor v. Sturgell, 553 U.S. 880, 891 n.4 (2008)(citing Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508 (2001)).

### 1. Claim Preclusion a/k/a Res Judicata.

"The doctrine of res judicata, or claim preclusion, 'bars a second suit involving the same parties or their privies based on the same cause of action.'" Roybal v. City of Albuquerque, 2009 U.S. Dist. LEXIS 45663, at *5 (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)).   "Under Tenth Circuit law, claim preclusion applies when three elements exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both suits." MACTEC, Inc. v. Gorelick, 427 F.3d at 831.   The Tenth Circuit has adopted the "transactional" approach from § 24 of the Restatement (Second) of Judgments to determine what constitutes a "cause of action" for claim preclusion. Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504.   Under this approach, a cause of action includes "all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards, 314 F.3d at 504 (quoting Nwosun v. Gen. Mills Rest., Inc., 124 F.3d 1255, 1257 (10th Cir. 1997)).   Claim preclusion does not, however, "extend from criminal prosecutions to civil actions."   18B Wright & Miller § 4474, at 420.

The Supreme Court, in Taylor v. Sturgell, clarified when preclusion may appropriately be applied to those who were not actual parties in the earlier litigation.   The Supreme Court stated:

"'It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" 553 U.S. at 884 (quoting Hansberry v. Lee, 311 U.S. 32, 40 (1940)).  The Supreme Court eliminated the broad doctrine of virtual representation, which allowed preclusion on the grounds of a sufficiently close relationship and which had prevailed in some federal circuits.  See Taylor v. Sturgell, 553 U.S. at 884, 890, 903-04.  Instead, the Supreme Court approved six exceptions to the general rule against non-party preclusion: (i) when the non-party "'agrees to be bound by the determination of issues in an action between others,'" 553 U.S. at 893 (quoting Restatement (Second) of Judgments § 40); (ii) based on pre-existing substantive legal relationships that "include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor," 553 U.S. at 894 (citation omitted)(internal quotation marks omitted); (iii) when the non-party was "adequately represented by someone with the same interests who" was a party in the prior lawsuit, 553 U.S. at 894 (citation omitted)(internal quotation marks omitted); (iv) when the non-party assumed control over the earlier litigation, see 553 U.S. at 895; (v) when the non-party is suing on behalf of the party to the earlier litigation, see 553 U.S. at 895; and (vi) where a "a special statutory scheme" forecloses successive litigation, provided the scheme is consistent with due process, 553 U.S. at 895.  The Supreme Court did not eliminate all aspects of virtual representation -- the situations other courts labeled virtual representation were too diverse and could be justified on traditional grounds.  Instead, the Supreme Court declared that "[t]he preclusive effects of a judgment in a federal-question case decided by a federal court should . . . be determined according to the established grounds for nonparty preclusion described in" Taylor v. Sturgell, 553 U.S. at 904.

2.   **Issue Preclusion a/k/a Collateral Estoppel**.

Where the causes of action are not identical, the second aspect of the doctrine of res judicata, termed "collateral estoppel" or "issue preclusion," may still preclude parties from relitigating issues in a second, not identical cause of action, where the particular issues were litigated in a prior case.  See In re Corey, 583 F.3d 1249, 1251 (10th Cir. 2009)("The doctrine of issue preclusion prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit.").  The Tenth Circuit has stated: "Under federal law, issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment."  In re Corey, 583 F.3d at 1251 (quoting Arizona v. California, 530 U.S. 392, 414 (2000); Restatement (Second) of Judgments § 27 cmt. e)(alterations and internal quotation marks omitted).  See Restatement (Second) of Judgments § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). The Tenth Circuit's test for issue preclusion under res judicata consists of four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been fully adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1093 (10th Cir. 2003)(quoting United States v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002)).

"It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding."  Emich Motors Corp. v. Gen. Motors Corp., 340 U.S. 558, 568 (1951).  See Considine v. United States, 683 F.2d 1285, 1286 (9th Cir. 1982)("A

prior conviction will estop a party from contesting in a later civil suit any element necessarily established in the criminal trial.").  The Tenth Circuit has stated that whether a defendant is estopped from relitigating an issue after a criminal trial "is whether the question was 'distinctly put in issue and directly determined' in the criminal prosecution." Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d 313, 316 (10th Cir. 1970)(quoting Emich Motors Corp. v. Gen. Motors Corp., 340 U.S. at 569).  Thus, "[i]n the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." Metros v. U.S. Dist. Court for the Dist. of Colo., 441 F.2d at 316 (quoting Emich Motors Corp. v. Gen. Motors Corp., 340 U.S. at 569)(internal quotation marks omitted).

> With respect to issues determined in a criminal prosecution: (1) A judgment in favor of the prosecuting authority is preclusive in favor of the government: (a) In a subsequent civil action between the government and the defendant in the criminal prosecution, as stated in § 27 with the exceptions stated in § 28.

Restatement (Second) of Judgments § 85.

## LAW REGARDING STARE DECISIS

The doctrine of stare decisis is a fundamental feature of the American common-law system that requires courts "to abide by, or adhere to, decided cases." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 953 (1992)(Rehnquist, C.J., concurring in part and dissenting in part).  Under the doctrine, lower courts are required to follow the precedential decisions of higher courts on questions of law.  See Hutto v. Davis, 454 U.S. 370, 375 (1982)(stating that lower federal courts must follow a precedent of the Supreme Court of the United States "no matter how misguided the judges of those courts may think it to be").  The United States Court of Appeals for the Tenth Circuit has explained that "precedent . . . includes not only the very narrow holdings of those prior cases, but also the reasoning underlying those holdings, particularly when such reasoning

articulates a point of law." United States ex rel. King v. Hillcrest Health Ctr., Inc., 264 F.3d 1271, 1279 (10th Cir.2001)(quoting United States v. Meyers, 200 F.3d 715, 720 (10th Cir.2000)).

The Supreme Court has emphasized that "[s]tare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827 (1991). While the Supreme Court has acknowledged that "'stare decisis is not an inexorable command,'" it has nevertheless cautioned that, "'even in constitutional cases, the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some special justification.'" Dickerson v. United States, 530 U.S. 428, 443 (2000)(first quoting State Oil Co. v. Khan, 522 U.S. 3, 20 (1997); and then quoting United States v. Int'l Bus. Machs. Corp., 517 U.S. 843, 856 (1996)). Accordingly, when a court evaluates a previous holding that it may have the power to overrule or deviate from, "its judgment is customarily informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. at 854. In reaching its decision, the court should consider: (i) whether the rule defies practical workability; (ii) whether the citizenry has come to rely on the rule to such a degree that its repudiation would lead to a special hardship; or (iii) whether the facts or circumstances that constituted the basis for the application of the rule have so changed they undermine the rule's justification. See Planned Parenthood of Se. Pa. v. Casey, 505 U.S. at 854–55.

## LAW REGARDING COLOR OF STATE LAW

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "'jurisdictional requisite for a § 1983 action,' which . . . furthers the fundamental goals of 'preserv[ing] an area of individual freedom by limiting the reach of federal law . . . [and] avoid[ing] imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'"  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995)(alterations in Jojola v. Chavez)(first quoting Polk Cnty. v. Dodson, 454 U.S. 312, 315 (1981); and then quoting Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988)(quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "[A] defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State."  West v. Atkins, 487 U.S. at 50.  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to conclude that an action was taken under color of state law, the court must determine that "'the conduct allegedly causing the deprivation of a federal right' [is] 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of

the state.'"  Jojola v. Chavez, 55 F.3d at 493 (first quoting Lugar v. Edmondson Oil Co., 457 U.S.

at 935-36 n.18; and then quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).

Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color

of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority

as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez,

55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the

Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the

circumstances:

> The under color of law determination rarely depends on a single, easily identifiable
> fact, such as the officer's attire, the location of the act, or whether or not the officer
> acts in accordance with his or her duty. . . .  Instead one must examine "the nature
> and circumstances of the officer's conduct and the relationship of that conduct to
> the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(first citing, and then

quoting, Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent

unfair and inequitable results which occur in the strict application of the doctrine of sovereign

immunity."  N.M.S.A. § 41-4-2A.  The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen
> ambit of his activity, the area within which the government has the power to act for
> the public good is almost without limit, and therefore government should not have
> the duty to do everything that might be done.

N.M.S.A. § 41-4-2A.  As a result, it was "declared to be the public policy of New Mexico that

governmental entities and public employees shall only be liable within the limitations of the Tort

Claims Act and in accordance with the principles established in that act."  N.M.S.A. § 41-4-2A.

The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent

person's standard of care in the performance of that duty."  N.M.S.A. § 41-4-2C.

1.      **Section 41-4-4(A).**

The NMTCA's § 41-4-4(A), which grants immunity and authorizes exceptions thereto, states:

> A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act [N.M.S.A. §§ 28-22-1 to 28-22-5] and by Sections 41-4-5 through 41-4-12 NMSA 1978.  Waiver of this immunity shall be limited to and governed by the provisions of Sections 41-4-13 through 41-4-25 NMSA 1978, but the waiver of immunity provided in those sections does not waive immunity granted pursuant to the Governmental Immunity Act.

N.M.S.A. § 41-4-2A.  Accordingly, a plaintiff may not sue a New Mexico governmental entity or its employees or agents, unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees.  See N.M.S.A. §§ 41-4-5 through 41-4-12.  See also Begay v. State, 1985-NMCA-117, ¶ 10, 723 P.2d 252, 255[5] ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 1986-NMSC-049, ¶ 10, 721 P.2d 1306, 1308 (1986).  A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the

---

[5]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Begay v. State, that, for a plaintiff to sue a governmental entity, the entity must come within one of the NMTCA's exceptions, and that a plaintiff may not imply the governmental entity's consent to suit.  Section 41-4-2 provides in part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act."  N.M.S.A. § 41-4-2.  The NMTCA also states that governmental entities and public employees acting in the scope of their duties shall be immune from liability for torts except as the NMTCA waives.  See N.M.S.A. § 41-4-4.  The Supreme Court of New Mexico has consistently reaffirmed that, for a plaintiff to sue a governmental entity or public employee acting within the scope of his or her duties, an NMTCA immunity waiver must apply.  See, e.g., Thompson v. City of Albuquerque, 2017-NMSC-021, ¶ 6, 397 P.3d 1279, 1281; Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 6, 916 P.2d 1313, 1313.

NMTCA contains a waiver of immunity.  See Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776[6] ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 11, 952 P.2d 474, 477 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city, its employees, or its agents unless the NMTCA waives immunity)[7]; Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127, ¶¶ 11-12, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board)[8]; Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 257 (finding that no waiver exists in the NMTCA for suit under Article II, § 11 of the New Mexico Constitution).

---

[6]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Barreras v. State of New Mexico Corrections Department that, absent affirmative legislation expressly confirming consent to be sued, New Mexico courts do not permit private lawsuits to enforce New Mexico constitutional rights if no NMTCA immunity waiver applies.  In Begay v. State, the Court of Appeals of New Mexico dismissed plaintiff's state constitutional claims against a governmental entity, because no NMTCA waiver applied.  See Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 257 ("We have determined that plaintiffs may not sue the state without its consent and that there is no express waiver for the medical examiner under the Tort Claims Act.").  The Court notes that Begay v. State clarifies that "[c]onsent to be sued may not be implied" under the NMTCA.  Begay v. State, 1985-NMCA-117, ¶ 10, 723 P.2d at 256.

[7]For the reasons discussed supra note 6, the Court concludes that the Supreme Court of New Mexico would, if presented with the issue, agree with this assertion in Chavez v. City of Albuquerque.

[8]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Rubio v. Carlsbad Municipal School District, because none of the express waivers under §§ 41-4-5 to -12 permit recovery for damages arising out of educational malpractice claims, and § 41-4-4(A) clearly exempts governmental entities and public employees acting within the scope of their duties from liability except as waived in sections 41-4-5 to -12.  See N.M.S.A. §§ 41-4-5 to -12.  As discussed supra note 6, the Supreme Court of New Mexico requires an express NMTCA immunity waiver to permit an NMTCA suit against a governmental entity or a public employee acting within the scope of his or her duties.

Accordingly, if no specific NMTCA waiver can be identified, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 1985-NMCA-117, ¶ 14, 723 P.2d at 255.  Further, the NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M.S.A. § 41-4-17(A).  A plaintiff thus "may not sue a New Mexico governmental entity, or its employees or agents, unless the plaintiff's cause of action fits within one of the exceptions to immunity that the NMTCA grants." Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1087 (D.N.M. 2016)(Browning, J.)("Pojoaque"), aff'd, Pueblo of Pojoaque v. New Mexico, 863 F.3d 1226 (10th Cir. 2017).  "A plaintiff also may not sue a governmental entity or its employees for a . . . damages claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity." Pojoaque, 214 F. Supp. 3d at 1087.  "Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint [for damages] against the governmental entity or its employees must be dismissed." Salazar v. City of Albuquerque, No. CIV 10-0645 JB/ACT, 2013 WL 5554185, at *24 (D.N.M. 2013)(Browning, J.)(citing Begay v. State, 1985-NMCA-117, ¶ 10,723 P.2d at 255).

2.    **Section 41-4-12**

"Section 41-4-12 of the [NMTCA] provides a waiver of immunity for certain torts committed by law enforcement officers and for negligence that causes a specified tort." Oliveros v. Mitchell, 449 F.3d 1091, 1096 (10th Cir. 2006)(citing Methola v. County of Eddy, 1980-NMSC-145, ¶ 23, 622 P.2d 234, 238; Caillouette v. Hercules, Inc., 1992-NMSC-008, ¶ 18, 827 P.2d 1306, 1311).  Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M.S.A. § 41-4-12.

> Thus, in order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 7, 916 P.2d at

1316.

A law enforcement officer is a "full-time salaried public employee of a governmental entity

whose principal duties under law are to hold in custody any person accused of a criminal offense,

to maintain public order or to make arrests for crimes, or members of the national guard when

called to active duty by the governor." N.M.S.A. § 41-4-3. "New Mexico courts have construed

this definition strictly." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-633, 2009 U.S. Dist.

LEXIS 47154, at *10 (D.N.M. April 20, 2009)(Browning, J.). See, e.g., Montes v. Gallegos, 812

F. Supp. 1165, 1172 (D.N.M. 1992)(Parker, J.)(holding that the mayor is not a law enforcement

officer under the NMTCA, notwithstanding his statutory authority and obligation to exercise law

enforcement functions); Anchondo v. Corr. Dep't, 1983-NMSC-051, ¶ 14, 666 P.2d 1255, 1258

(holding that the Secretary of Corrections and the Warden of a state penitentiary are not law

enforcement officers under the NMTCA); Dunn v. McFeeley, 1999-NMCA-084, ¶ 25, 984 P.2d

760, 767[9] (holding that the Office of the Medical Investigator's Medical Investigator and the crime

---

[9]The Court predicts that the Supreme Court of New Mexico, if presented with the issue,

laboratory technician are not law enforcement officers under the NMTCA), cert. denied, No. 25,764, 981 P.2d 1207 (1999); Coyazo v. State, 1995-NMCA-056 ¶ 20, 897 P.2d 234, 238 (holding that the public defender and his staff are not law enforcement officers under § 41-4-3(D)); Callaway v. N.M. Dep't of Corr., 1994-NMCA-049, ¶¶ 11-12, 875 P.2d at 397 (holding that correctional officers at a penitentiary are not law enforcement officers under the NMTCA, notwithstanding their statutory power to make arrests);[10] Vigil v. Martinez, 1992-NMCA-033,

_____

would agree with the result in Dunn v. McFeeley that the Office of the Medical Investigator's Medical Investigator and the crime laboratory technician in Dunn v. McFeeley are not law-enforcement officers under the NMTCA. Section 41-4-3 states that a law-enforcement officer's principal duties under law are to hold persons accused of a criminal offense in custody, to maintain public order or make arrests, or are members of the national guard when the governor calls them to active duty. See N.M.S.A. § 41-4-3. In Chavez-Rodriguez v. City of Santa Fe, the Court stated that New Mexico courts construe the § 41-4-3 definition strictly. See 2009 U.S. Dist. LEXIS 47154, at *10. The Court of Appeals of New Mexico concluded that the complaint contained no allegations that the principal duties of the medical investigator and crime scene technician related to law enforcement. See Dunn v. McFeeley, 1999-NMCA-084, ¶¶ 24-25, 984 P.2d 760, 767. Furthermore, in Begay v. State, the Court of Appeals of New Mexico concluded that a medical investigator is not a law-enforcement officer and the Supreme Court of New Mexico did not alter that determination when it reversed Begay v. State on other grounds. See Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306. Although the Court is reluctant to read too much into a denial of a petition for certiorari, the Supreme Court of New Mexico denied the petition from Dunn v. McFeeley, which suggests a disinclination to reconsider the Court of Appeals of New Mexico's decision.

[10]While the Court is reluctant to read too much into a denial of a petition of certiorari, the Court predicts that the Supreme Court of New Mexico would, if presented with the issue, conclude that corrections officers are not law-enforcement officers under the NMTCA, and the Court bases its prediction, at least in part, on the fact that the Supreme Court of New Mexico denied the petition for certiorari in Callaway v. New Mexico Department of Corrections. See Callaway v. N.M. Dep't of Corr., 118 N.M. 90, 879 P.2d 91 (unpublished table decision)(denying certiorari). The Court discussed Callaway v. New Mexico Department of Corrections in Lymon v. Aramark Corp., 728 F. Supp. 2d at 1255-56.

In Anchondo v. Corrections Department, the Supreme Court of New Mexico received a certified question from the Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, asking: "Are the Secretary of Corrections and the Warden of the State Penitentiary in Santa Fe 'law enforcement officers within the meaning of Section 41-4-3(D), NMSA 1978?" 100 N.M. at 109, 666 P.2d at 1256. The Supreme Court of New Mexico found that the Secretary of Corrections and the Warden are not law-enforcement officers. See 100 N.M. at

¶ 20, 832 P.2d 405, 412 (holding that probation and parole officers are not law enforcement

officers under the NMTCA).[11]   See also Johnson v. Holmes, 377 F. Supp. 2d 1069, 1083 (D.N.M.

109, 666 P.2d at 1256.  The Supreme Court of New Mexico explained:

> From looking at the statutes, we see that neither the Secretary of
> Corrections nor the Warden engage in any of the traditional duties
> of "law enforcement officers."  They do not deal directly with the
> daily custodial care of prison inmates.  Moreover, because they do
> not have commissions, they have no power to make arrests or to take
> people into custody should a violation of the public order occur.
> They are merely administrative officers appointed by the governor
> to oversee, administer, and supervise the state's corrections system.

100 N.M. at 109-10, 666 P.2d at 1256-57.  "To determine whether positions are of
a law enforcement nature, this Court will look at the character of the principal duties
involved, those duties to which employees devote the majority of their time."
Anchondo v. Corr. Dep't, 100 N.M. at 110, 555 P.2d at 1257.

Lymon v. Aramark Corp., 728 F. Supp. 2d at 1255-56.  In Callaway v. New Mexico Department
of Corrections, the Court of Appeals of New Mexico referenced the statutory duties of prison
guards as set forth in N.M.S.A. § 33-2-15:

> The employees of the penitentiary shall perform such duties in the charge and
> oversight of the penitentiary, care of the property belonging thereto, and in the
> custody, government, employment and discipline of the convicts as shall be
> required of them by the corrections division [corrections department] or the warden,
> in conformity with law and rules and regulations prescribed for the government of
> the penitentiary.

Callaway v. N.M. Dep't of Corr., 1994-NMCA-049, ¶ 10, 875 P.2d at 397 (internal quotation
marks omitted)(quoting N.M.S.A. § 33-2-15).  The principal statutory duties of corrections
officers, pursuant to § 33-2-15, are supervisory, administrative, and custodial, but they do not "hold
in custody any person accused of a criminal offense, to maintain public order or to make arrests
for crimes, or members of the national guard when called to active duty by the governor."
N.M.S.A. § 41-4-3.  Although corrections officers do hold in custody persons who have already
been convicted, § 41-4-3 specifies that a law-enforcement officer "hold[s] in custody any person
accused of a criminal offense."  N.M.S.A. § 41-4-3.

   [11]The Court predicts that the Supreme Court of New Mexico, if presented with the issue,
would agree with Vigil v. Martinez that probation and parole officers are not law-enforcement
officers under the NMTCA.  The Court of Appeals of New Mexico explained in Rayos v. State ex
rel. New Mexico Department of Corrections, Adult Probation and Parole Division:

   In the more than twenty years since Vigil was decided, the New Mexico

2004)(Browning, J.)("Akin to a law enforcement officer is, as a matter of law, insufficient to waive sovereign immunity under § 41-4-12 NMSA 1978."), aff'd, 455 F.3d 1133 (10th Cir. 2006).

The New Mexico Court of Appeals has held that corrections officers who hold convicted persons in custody are not law enforcement officers under § 41-4-3(D), which defines law enforcement officer as used in § 41-4-12.  See Callaway v. N.M. Dep't of Corr., 1994-NMSC-049, ¶ 12, 875 P.2d at 397 ("[W]e affirm the trial court's determination that corrections officers are not law enforcement officers under Section 41-4-3(D)").  In Anchondo v. Corrections Department, the Supreme Court of New Mexico received a certified question from the Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, asking: "Are the Secretary of Corrections and the Warden of the State Penitentiary in Santa Fe 'law enforcement officers' within

---

Legislature has not amended the statute to include probation and parole officers within the definition of law enforcement officers.  Moreover, every subsequent state and federal decision -- both published and unpublished -- on the "law enforcement officer" waiver has followed Vigil, albeit with little meaningful analysis or none at all.  See, e.g., Limacher, 2008-NMCA-163, ¶ 17, 145 N.M. 344, 198 P.3d 370; Coyazo, 1995-NMCA-056, ¶ 17, 120 N.M. 47, 897 P.2d 234; Trask v. Franco, 446 F.3d 1036, 1048 (10th Cir. 2006); Ricks v. N.M. Adult Prob. & Parole Dep't, No. CV-11-608, slip op. at 32-33 (D.N.M. Aug. 9, 2012); Wells v. N.M. Adult Prob. & Parole, No. CV-09-150, slip op. at 3 (D.N.M. Feb. 5, 2010); Kenney v. New Mexico, No. CV-07-0422, slip op. at 8 (D.N.M. Oct. 2, 2007).   Against this backdrop, there simply has been no change in the law to warrant a departure from Vigil.  See Trujillo v. City of Albuquerque, 1998-NMSC-031, ¶ 34, 125 N.M. 721, 965 P.2d 305 (noting, in relevant part, that before overturning precedent, we must consider "whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine" and "whether the facts have changed in the interval from the old rule to reconsideration so as to have robbed the old rule of justification" (internal quotation marks and citation omitted)).  Thus, our sole task here is to determine whether the facts have so changed that the principal duties of probation and parole officers now fall within one of the three relevant categories of principal duties of law enforcement officers enumerated in Section 41-4-3(D) of the TCA.

Rayos v. State ex rel. N.M. Dep't of Corr., Adult Prob. & Parole Div., 2014-NMCA-103, ¶ 11, 336 P.3d 428, 432, cert. granted, Rayos v. State, 2014-NMCERT-010, 339 P.3d 426 (unpublished table decision), cert. quashed, Rayos v. State, 2015-NMCERT-007, 368 P.3d 2 (unpublished table decision).

the meaning of Section 41-4-3(D), NMSA 1978?"  1983-NMSC-051, ¶ 1, 666 P.2d at 1255.  The

Supreme Court of New Mexico concluded that the Secretary of Corrections and the Warden are

not law enforcement officers.  See 1983-NMSC-051, ¶ 7, 666 P.2d at 1256.  The Supreme Court

of New Mexico explained:

> From looking at the statutes, we see that neither the Secretary of Corrections nor the Warden engage in any of the traditional duties of "law enforcement officers."  They do not deal directly with the daily custodial care of prison inmates. Moreover, because they do not have commissions, they have no power to make arrests or to take people into custody should a violation of the public order occur. They are merely administrative officers appointed by the governor to oversee, administer, and supervise the state's corrections system.

Anchondo v. Corr. Dep't, 1983-NMSC-051, ¶ 7, 666 P.2d at 1256.

## LAW REGARDING QUALIFIED IMMUNITY

Government officials performing "discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457

U.S. 800, 818 (1982).  Qualified immunity "protects federal and state officials from liability for

discretionary functions, and from 'the unwarranted demands customarily imposed upon those

defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG,

2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500

U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from state

officials who have violated his or her constitutional or statutory rights.  42 U.S.C. § 1983.  Under

Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971), a

plaintiff may seek money damages from federal officials who have violated his or her

constitutional rights.[12]   The Supreme Court, however, deems it "untenable to draw a distinction

for purposes of immunity law between suits brought against state officials under § 1983 and suits

brought directly under the Constitution against federal officials."   Butz v. Economou, 438 U.S.

478, 504 (1978).   Officials may assert qualified immunity to ensure that fear of liability will not

"unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635,

638, (1987).   See Green v. Padilla, 484 F. Supp. 1098, 1129.

If a government official has not violated a "clearly established" right, the official is shielded

from personal liability.   Harlow v. Fitzgerald, 575 U.S. at 818.   Qualified immunity therefore

"provides ample protection to all but the plainly incompetent or those who knowingly violate the

law." Malley v. Briggs, 475 U.S. 335, 341 (1986).   Qualified immunity protects officers who have

"reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws.   Saucier

v. Katz, 533 U.S. 194, 205 (2001).   A court

> can often avoid ruling on the plaintiff's claim that a particular right exists. If prior
> case law has not clearly settled the right, and so given officials fair notice of it, the
> court can simply dismiss the claim for money damages. The court need never
> decide whether the plaintiff's claim, even though novel or otherwise unsettled, in
> fact has merit.

---

[12]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics has been extended,
however, to only a handful of constitutional rights.   See Davis v. Passman, 442 U.S. 228, 248
(1979)(finding an implied cause of action for violations of the equal protection principles
enmeshed within the due process clause of the Fifth Amendment to the United States Constitution,
U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for
damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to
the United States Constitution).   The Supreme Court has expressed hesitation about federal courts
extending Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics into new contexts.
See Hernandez v. Mesa, 140 S. Ct. 735, 750 (2020)("When evaluating whether to extend Bivens,
the most important question 'is "who should decide" whether to provide for a damages remedy,
Congress or the courts?' The correct 'answer most often will be Congress'" (quoting Ziglar v.
Abbasi, 137 S. Ct. 1843, 1857 (2017), quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the Tenth Circuit's qualified-immunity analysis:  "(1) protecting against 'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages suits from entering public service;' and (3) guarding against employees being distracted from their duties."  Est. of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity therefore shields government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity, it "creates a presumption that they are immune from suit," not a presumption that they are immune from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct, such that "every reasonable officer would have understood" as much.  Est. of Smart by Smart v. City of Wichita, 951 F.3d at 1178.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pojoaque, 214 F. Supp. at 1079.

### 1.    The Procedural Approach to Qualified Immunity.

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified-immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), lower courts were directed to decide, first, whether the facts alleged or shown by the plaintiff make out a constitutional violation, and, if so, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. at 200.

The Supreme Court's decision in <u>Pearson v. Callahan</u>, however, made the so-called "<u>Saucier</u> two-step" advisory rather than mandatory, noting that <u>Saucier v. Katz</u>'s "'rigid order of battle'" had faced criticism from lower courts on "'practical, procedural, and substantive grounds.'"   <u>Pearson v. Callahan</u>, 555 U.S. at 234 (quoting Pierre N. Leval, <u>Judging Under the Constitution: Dicta About Dicta</u>, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).  Though the Supreme Court recognizes that the <u>Saucier</u> rule was "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  <u>Pearson v. Callahan</u>, 555 U.S. at 237.  The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." <u>Pearson v. Callahan</u>, 555 U.S. at 241 (alterations omitted).  <u>See</u> <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[13] qualified immunity's clearly established prong: when (i) the first, constitutional violation

---

[13]In <u>Camreta v. Greene</u>, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same

question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[14]

---

sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81 (10th Cir. 2011). The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court should exercise its discretion carefully.

[14]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not

protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: <u>Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases</u>, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the</u> Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, <u>Constitutional Alternatives to the Exclusionary Rule</u>, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  <u>See</u> 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[15]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts

_____

municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[15]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.
    The "Saucier two-step" encourages courts to articulate the constitutional rights at issue.  Before Pearson v. Callahan, 555 U.S. 223 (2009), made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.  Associate Justice of the United States Supreme Court Stephen Breyer wrote, before Pearson v. Callahan, that he "would end the failed Saucier experiment now."  Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).  Joined by Associate Justices of the United States Supreme Court Ruth Bader Ginsburg and Stephen Breyer, Associate Justice of the United States Supreme Court John Paul Stevens criticized Saucier v. Katz because it was an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity." Bunting v. Mellon, 541 U.S. 1019, 1019 (2004).  Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia wrote: "We should either make clear that constitutional determinations are not insulated from our review . . . or else drop any pretense at requiring the ordering in every case."  Bunting v. Mellon, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari).
    Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting constitutional rights.  In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulated constitutional law.  See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).  Chief Justice Rehnquist opined that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official

should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pojoaque, 214 F. Supp. 3d at 1028, 1082-83.

### 2.    Clearly Established Rights.

A right is "clearly established" when it was "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. at 664).  A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether

---

conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999).  The evidence to support Chief Justice Rehnquist's assertion, however, is mixed. See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's development of the Wilson-Saucier sequencing doctrine.").  See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights").  See also Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010).  The bottom line is that a trial court often -- if not frequently -- needs to decide whether the constitutional right was violated before deciding if it was clearly established.

the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).    In other words, existing precedent must have placed the constitutional or statutory question "beyond debate." Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'" White v. Pauly, 137 S. Ct. 548, 552 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742). The Supreme Court refers to this as a "longstanding principle." White v. Pauly, 137 S. Ct. at 552. Nevertheless, the clearly established law must be "particularized" to the case's facts. Anderson v. Creighton, 483 U.S. at 640. If the clearly established law at issue is not sufficiently particularized, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. at 639. "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers. United States v. Lanier, 520 U.S. 259, 271 (2017). See White v. Pauly, 137 S. Ct. at 552 (reiterating this principle). Importantly, the "unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. at 640. See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting in a case where the violation of the Eighth Amendment to the United States Constitution was "obvious" that there need not be a materially similar case for the right to be clearly established)).    A court must, therefore, "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances." Green v. Padilla, 484 F. Supp. 3d 1098, at 1134 (citing City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019)).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court has recently clarified that this is not always required.  See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor").  The Supreme Court, in a short per curiam opinion, suggested an objective, "no reasonable correctional officer" standard when it held that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 141 S. Ct. at 53.  In Taylor, corrections officers housed an inmate in "shockingly unsanitary cells."  Taylor, 141 S. Ct. at 53.  One cell was covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'"  141 S. Ct. at 53 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)).  Correctional officers confined the plaintiff in this cell for four days, but the plaintiff did not eat or drink because he feared that his food and water would be contaminated.  See 141 S. Ct. at 53.  Correctional officers then moved the plaintiff to a second cell that was "frigidly cold" and was equipped with "only a clogged drain in the floor to dispose of bodily wastes."  141 S. Ct. at 53.  The plaintiff held his bladder for more than twenty-four hours before finally involuntarily relieving himself, which caused the clogged drain to overflow and "raw sewage to spill across the floor."  141 S. Ct. at 53.  Because the plaintiff was

not provided a bed and was confined without clothes, the plaintiff was "left to sleep naked in sewage." 141 S. Ct. at 53.

The Fifth Circuit held that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it granted the corrections officers qualified immunity because the law was not clearly established.  See Taylor, 141 S. Ct. at 53 (citing Taylor v. Stevens, 946 F.3d at 222).  The Fifth Circuit concluded that the corrections officials did not have "fair warning" that confining the plaintiff in these conditions would be unconstitutional.  Taylor v. Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. at 741).  The Supreme Court reversed, holding that the Fifth Circuit erred when it granted qualified immunity on this basis.  See Taylor, 141 S. Ct. at 53.  Although the plaintiff could not identify a case on point, the Supreme Court noted that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at 1240 (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals of superior courts.[16]  One such unwritten signal is that "a nigh identical case must exist for the law to be clearly established."  Caldwell v. University of N.M. Bd. of Regents, No. 20-CIV-0003

---

[16]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

JB/JFR, 2020 WL 7861330, at *33 n.14 (D.N.M. Dec. 31, 2020)(Browning, J.).[17]  As numerous

Courts of Appeals have recently noted, however, Taylor clarifies that it is no longer the case that

---

[17]The Court notes, as it has elsewhere, see, e.g., Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14, that qualified immunity is a problematic doctrine.  This is particularly true of the Supreme Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14.

Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  See also White v. Pauly, 137 S. Ct. 548, 552 (2017)(criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment).  In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue.  As United States Circuit Judge for the Court of Appeals

for the Fifth Circuit Don Willett notes, this creates a Catch-22.  See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring dubitante)(opinion withdrawn on rehearing).  The plaintiffs "must produce precedent even as fewer courts are producing precedent.  Important constitutional questions go unanswered precisely because those questions are yet unanswered.  Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499.  In short, "[n]o precedent = no clearly established law = no liability.  An Escherian Stairwell.  Heads defendants win, tails plaintiffs lose."  Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."  Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed March 2, 2018)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification."  Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act."  Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted).  "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make."  Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted).  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cnty. Comm'rs for Cnty. of Dona Ana, 2017 WL 3951706, at *3; Brown v. City of Colo. Springs, 2017 WL 4511355, at *8, and willing to reverse district

an almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th at 1241 ("Just like any reasonable corrections officer should have understood the inmate in Taylor's conditions . . . offended the Constitution, so too should any reasonable prosecutor understand that that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."); Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court held in Taylor that "there does not need to be a case directly on point" when no reasonable officer could have concluded that the challenged action was constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. 2021)(noting that Taylor reaffirmed that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's decision in Taylor sends the signal to the lower courts that they can deny qualify immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

---

court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

There are, therefore, two possible interpretations of Taylor.  First, Taylor could simply clarify that the holding in Hope v. Pelzer, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts.  This reading of Taylor would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that only applies in case with "extreme circumstances" or "particularly egregious" facts.  Second, Taylor could mean that a court must now ask whether the conduct at issue was particularly egregious such that no reasonable officer could have concluded that their actions are constitutional, and, if so, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is confusion both between and within the Courts of Appeals about Taylor's scope.  Compare Bates v. Schwarzenegger, 832 F. App'x 509, 511 (9th Cir. 2020)(unpublished)(mem.)(citing Taylor for the proposition that the "Supreme Court has repeatedly, including very recently, reaffirmed and applied the doctrine of qualified immunity"), with Rico v. Ducart, 980 F.3d 1292, 1307 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part)(explaining that, in Taylor, "the Court held that the prisoner's rights were so obvious that 'ambiguity in the caselaw' could not create any doubt" that the officer's conduct was unconstitutional (citing Taylor, 141 S.Ct. 52, 53, n.2)).  Since Taylor, courts have asked not just whether the law was clearly established through a factually similar case from that Circuit or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable officer could have concluded that" their actions were constitutionally permissible.  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at 1240.  In other words, in addition to asking whether the officer was theoretically on notice

that they were acting unlawfully,[18] the court must also ask whether the conduct at issue was

"particularly egregious" -- an apparently objective question.   McCoy v. Alamu, 141 S. Ct. 1364,

1364 (mem)(2021)(vacating and remanding in light of Taylor even though the conduct at issue

was likely not "particularly egregious").[19]

---

[18]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that their conduct is unlawful because they know the holdings of both watershed constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.   See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that although police departments do regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").   The Court has previously noted:

> It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[19]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of McCoy v. Alamu: (i) that the Court remanded so that the Fifth Circuit could consider whether the case involved "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remanded so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.   Colin Miller, The End of Comparative Qualified Immunity, 99 Tex. L. Rev. Online 217, 224 (2021)("Miller, The End of Comparative Qualified Immunity").   Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by

The United States Court of Appeals for the Third Circuit, for example, notes that Taylor did not affect whether three state legislators who took a public stand against the sale of state-owned property and then tried to pass a law divesting the State's ability to sell it were entitled to qualified immunity, because the legislators' actions were "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution." HIRA Educ. Servs. N. Am. v. Augustine, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting Taylor, 141 S. Ct. at 53). The United States Court of Appeals for the Seventh Circuit, too, concludes that Taylor means an officer is not entitled to qualified immunity if his or her conduct was "particularly egregious." Lopez v. Sheriff of Cook Cnty., 993 F.3d 981, 991 (7th Cir. 2021). In Lopez v. Sheriff of Cook County, the Seventh Circuit found that an off-duty correctional officer who shot and then used as a human shield a man who fired his gun into the air near a crowd after a scuffle did not act "so egregious[ly] that any reasonable officer would know they [were] violating the Constitution notwithstanding the lack of an analogous decision."[20] 993 F.3d at 991. The United States Court of Appeals for the

_____

government officers who seek qualified immunity." Miller, The End of Comparative Qualified Immunity, at 224 (no citation for quotation).

[20]The Court does not agree with the Seventh Circuit's conclusion. An off-duty officer using someone he had just shot multiple times as a human shield to "ward off" someone else with a gun -- the human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights. Lopez v. Sheriff of Cook Cnty., 993 F.3d 992. Even if the officer was trying to protect himself and the public, firing a gun near a crowd does not justify being used as fleshy shield to protect an off-duty officer who had shot that very shield moments earlier. Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations")(July 17, 1998), prohibit such conduct. A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity. The Seventh Circuit found that the situation was "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he had just shot multiple times was a violation that was "so egregious that any reasonable officer

- 61 -

Ninth Circuit also distinguishes Taylor on the basis of the conduct's severity.  See Rico v. Ducart, 980 F.3d 1292, 1300 n.9 (9th Cir. 2020).  In Rico v. Ducart, the Ninth Circuit held that correctional officers who performed inmate-welfare checks that, because of the design of the prison, created loud noises every forty-five minutes were entitled to qualified immunity because the facts were not "as extreme as those present in" Taylor.  980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit also has decided that Taylor "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles."  O'Doan v. Sanford, 991 F.3d 1027, 1044 (9th Cir. 2021).

The other Courts of Appeals have, however, characterized Taylor as only reaffirming an "extreme circumstances" or "obvious clarity" exception.  The Fifth Circuit, for example, has distinguished Taylor, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it did not apply to a case about mental healthcare in prison.  Landry v. Laborde-Lahoz, 852 F. App'x 123, 129 (5th Cir. 2021)(unpublished).[21]  The Fifth Circuit, however, like other Courts of Appeals, has not adopted a consistent approach to Taylor.  The Fifth Circuit also has noted that "it would have been 'obvious' to a reasonable officer that" several officers using

---

would know they are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.  Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct was a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields to violate some other clearly established law.  If human shields are banned in war, they should not be allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

[21]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does not disagree with the case's result.  The Fifth Circuit reasons that Taylor did not support the plaintiff's argument that County officials acted with deliberate indifference in violation of the Eighth Amendment, because it was "factually distinct."  Landry v. Laborde-Lahoz, 852 F. App'x 123, 129 (5th Cir. 2021).  That Taylor is factually distinct has no bearing on the merits of a deliberate-indifference claim but impacts its applicability to the qualified-immunity question.

their body weight to apply pressure to an unarmed man who did not resist arrest while the man

was in the "maximal-restraint" position for five-and-a-half minutes so that the man stopped

breathing and his lips turned blue -- while officers nearby "milled around"-- would constitute "such

a severe tactic against this particular person would be constitutionally proscribed," and that the

officer would "have no recourse to qualified immunity." Aguirre v. City of San Antonio, 995 F.3d

395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring).   The Fifth Circuit has further cited Taylor

to support its assertion that "'in an obvious case,' general standards 'can clearly establish the

answer, even without a body of relevant law.'"   Roque v. Harvel, 993 F.3d 325, 335 (5th Cir.

2021)(quoting Brousseau v. Haugen, 542 U.S. 194, 199 (2004)).   In Roque v. Harvel, however,

the Fifth Circuit did not say what those "general standards" might be, from where they might come,

or where a court might look for them, and then proceeded to characterize qualified-immunity law

as requiring a case on point in almost all circumstances.   993 F.3d at 335.[22]   More recently,

---

[22]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not consistent.  In Tucker v. City of Shreveport, 998 F.3d 165 (2021), the Fifth Circuit did not cite Taylor, but writes that

> "[q]ualified immunity is justified unless *no* reasonable officer could have acted as [the defendant officers] did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did]."  Mason v. Faul, 929 F.3d 752, 764 (5th Cir. 2019, cert. denied, 141 S. Ct. 116, 207 (2020)(citing District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018)("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.   Otherwise, the rule is not one that 'every reasonable official' would know.")).

998 F.3d at 176-77.   The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.   See 998 F.3d 165.   As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.   See 141 S. Ct. at 54.   See Ramirez v. Guadarrama, 2 F.4th 506, __ (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

however, the Fifth Circuit acknowledged that Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 3 F.4th 198, 206 (5th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53-54).  The Fifth Circuit stressed, however, that this is a "high standard," because the facts must be "'particularly egregious.'"  Cope v. Cogdill, 3 F.4th at 206 (quoting Taylor, 141 S. Ct. at 53-54).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For example, the Tenth Circuit treated Taylor as an example of the rule of United States v. Lanier, 520 U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, 835 F. App'x 379, 382 (10th Cir. 2020)(unpublished).  This treatment of Taylor asks about the relationship between a "general constitutional rule *already identified* in the decisional law" and the "conduct in question," and asks whether that rule is applies with "obvious clarity."  United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'"  Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(first quoting Riggins v. Goodman, 572 F.3d at 1101; and then quoting Taylor, 141 S. Ct. at 53-54).

In Frasier v. Evans, however, the Tenth Circuit wrote that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable

government officials fair warning that their conduct is constitutionally or statutorily unlawful."
Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The
Tenth Circuit continued by noting that the situation before them -- several police officers
surrounding a man who asked one of the officers for a statement about the force the officer had
just used on a "uncooperative suspect," and then one of the officers grabbing the tablet and
searching it for a video of the encounter -- was "not such a rare case" as Taylor or Hope v. Pelzer,
536 U.S. at 730.  Frasier v. Evans, 992 F.3d at 1021-22.  In other words, rather than having to point
to an existing case with sufficiently analogous facts, a plaintiff instead can defeat a claim for
qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious"
standard.  See Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit held that even without a prior precedent clearly
establishing the law, it was "'obvious'" that a prosecutor providing materially false information to
a medical examiner that influences his expert opinion whether a homicide occurred -- and then
putting that medical examiner on the stand to testify about that false information -- is "'obviously
egregious.'"  Truman v. Orem City, 1 F. 4th at 1240 (quoting District of Columbia v. Wesby, 138
S. Ct. 577, 590 (2018), then Pierce v. Gilchrist, 359 F.3d at 1298).  The Tenth Circuit, in Truman
v. Orem City, comparing the facts directly to those in Taylor, continued: "Just like any reasonable
correctional officer should understand the inmate in Taylor's conditions of confinement offended
the Constitution, so too should any reasonable prosecutor understand that providing a medical
examiner fabricated evidence and then putting him on the stand to testify based on that false
information offends the Constitution."  1 F. 4th at 1241.  In reaching its conclusion in Truman v.
Orem City, the Tenth Circuit reiterated that its qualified-immunity analysis is "'not a scavenger
hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to

the conduct here for the officials to have been on notice of clearly established law." Truman v. Orem City, 1 F. 4th at 1235 (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)). Because the Tenth Circuit concluded that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at 1239, it found that the plaintiff had plausibly alleged a fabrication-of-evidence claim against the prosecutor. 1 F. 4th at 1241. This treatment of Taylor does not just ask about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general constitutional principles that courts have already promulgated, because "no reasonable officer" could have concluded the conduct to be lawful, Taylor, 141 S. Ct. at 53.

The Court does its best to follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[23] The Court will therefore proceed with both lines of

_____

[23]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier 520 U.S. 259 and Hope v. Pelzer, 536 U.S. 730, and stands for the proposition that an officer is not entitled to qualified immunity when their conduct is "particularly egregious" such that "any reasonable officer should have realized" that their conduct offends the Constitution. Taylor, 141 S. Ct. at 54. See also Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 141 S. Ct. at 53)). The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021). See Ramirez v. Guadarrama, 2 F.4th 506, __ (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23. On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts patch the hole in the defense's line of reasoning, since it is so wide that the nation can run a truck through it.

analysis.  An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Est. of Smart by Smart v. City of Wichita, 951 F.3d at 1178 (quoting Perea v. Baca, 817 F.3d at 1202 ("'To overcome this presumption,' the plaintiffs bear the burden of 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right.'").  See also Riggins v. Goodman, 572 F.3d at 1107 ("When a defendant asserts qualified immunity at summary judgment . . . the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); Pojoaque, 214 F. Supp. 3d at 1079.

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. 386, 394 (1989).  The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard.  See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

Amendment and its 'reasonableness' standard . . . .").   Under this standard the Court must "careful[ly] balance . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."   Graham v. Connor, 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 7 (1985)).   The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."   Graham v. Connor, 490 U.S. at 397.   Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."   Saucier v. Katz, 533 U.S. at 205.   When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."   Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

1.      **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.   In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.   These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.   In Weigel v. Broad, 544 F.3d 1143, the Tenth Circuit also reiterated:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

544 F.3d at 1151-52 (quoting Graham v. Connor, 490 U.S. at 396). The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." Est. of Larsen v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

As the Court has noted before, officers may not use the same level of force "to arrest a submissive misdemeanant" as they "may use to apprehend a fleeing felon." Favela v. City of Las Cruces ex rel. Las Cruces Police Dep't, 398 F. Supp. 3d 858, 919 (D.N.M. 2019)(Browning, J.)(citing Casey v. City of Fed. Heights, 509 F.3d 1278, 1282 (10th Cir. 2007)). "The excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." Cortez v. McCauley, 478 F.3d at 1126. "If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force." Cortez v. McCauley, 478 F.3d at 1127. For example, in Buck v. City of Albuquerque, the Tenth Circuit concluded a reasonable jury could find that, while engaging a misdemeanor suspect who did not flee, an officer acted unreasonably by grabbing him, dragging him, pushing his face onto the pavement, and kneeing him in the back. See 549 F.3d 1269, 1290 (10th Cir. 2008).

The Tenth Circuit concluded that tasing a person in a non-emergency situation, where that person did not pose a threat, "was objectively unreasonable." Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010). Weighing the factors established in Graham v. Connor, 490 U.S. at 396, and reiterated in Weigel v. Broad, 544 F.3d at 1151-52, the Tenth Circuit concluded that: (i) "the 'nature and quality' of the intrusion . . . was quite severe" because it was done with

"a Taser -- a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain," which "unquestionably 'seizes' the victim in an abrupt and violent manner"; (ii) the officer was responding to a "non-emergency request for help finding [a person], not to a report of a criminal activity -- he was investigating a non-injurious assault," at most a misdemeanor under state law if any crime had occurred at all; (iii) the suspect did not pose an immediate threat to the officer or anyone else at the scene; and (iv) "when the Taser was deployed [the suspect] was neither actively resisting nor fleeing arrest." Cavanaugh v. Woods Cross City, 625 F.3d at 665.   The Tenth Circuit similarly concluded that officers in Perea v. Baca had used excessive force in subduing a mentally ill misdemeanant, because: (i) "the officers were performing a welfare check . . . [,] Perea's minor [traffic] offense -- at most -- supported the use of minimal force . . . [and] us[ing] a taser . . . ten times in two minutes . . . exceeded the minimal force that would be proportional to Perea's crime"; (ii) "Perea was [not] a danger to anyone other than himself before they attempted to effect an arrest"; and (iii) "[a]lthough use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not." Perea v. Baca, 817 F.3d at 1202-03.

In Holland, the Tenth Circuit addressed the constitutionality of law enforcement displaying and pointing firearms at individuals. See 268 F.3d at 1192-93.   When the sheriff in Holland sent a SWAT team to search for and arrest one individual, the "officers knew in advance that other persons, including children would be present."   268 F.3d at 1192.   During the search, "the SWAT deputies held each of the [children and two others] at gunpoint, initially forcing several of them to lie down on the ground for ten to fifteen minutes, and ultimately gathering all of them in the living room of the residence where they were held until all but [the original suspect] were released." Holland, 268 F.3d at 1191.   The Tenth Circuit explains:

The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.  Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time. "These are the very ingredients relevant to an excessive force inquiry." McDonald[ v. Haskins, 966 F.2d 292, 294 (7th Cir. 1992)].  Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.  Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.

In McDonald[ v. Haskins], the Seventh Circuit explained:

> It should have been obvious to Haskins that his threat of deadly force -- holding a gun to the head of a 9-year-old and threatening to pull the trigger -- was objectively unreasonable given the alleged absence of any danger to Haskins or other officers at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat. As we observed in [Lester v. City of Chicago, 830 F.2d 706, 711 (7th Cir. 1987)], "Although the issue in Garner was deadly force, implicit in its totality of the circumstances approach is that police use of less than deadly force would violate the Fourth Amendment if not justified under the circumstances."

[McDonald v. Haskins,] 966 F.2d at 295.

Taken in the light most favorable to the plaintiffs-appellees, the facts alleged concerning the pointing of firearms at the child bystanders found at the . . . residence on April 16, 1996 show the officers' conduct violated a constitutional right.  While the SWAT Team's initial show of force may have been reasonable under the circumstances, continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation outside the residence was not justified under the circumstances at that point.  This rendered the seizure of the children unreasonable, violating their Fourth Amendment rights.

Holland, 1192-93.

## 2.    Least- or Less-forceful Alternatives in Excessive-Force Cases.

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to gain custody, so long

as the use of force is reasonable under <u>Graham v. Connor</u>, 490 U.S. at 395-98.   The Fourth

Amendment requires only that the defendant officers chose a "reasonable" method to end the threat

that the plaintiff posed to the officers in a force situation, regardless the availability of less intrusive

alternatives.   <u>Graham v. Connor</u>, 490 U.S. at 397.

In <u>Michigan Department of State Police v. Sitz</u>, 496 U.S. 444, 450-51 (1990), the Supreme

Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated

that <u>Brown v. Texas</u>, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the
> decision as to which among reasonable alternative law enforcement techniques
> should be employed to deal with a serious public danger.  Experts in police science
> might disagree over which of several methods of apprehending drunken drivers is
> preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice
> among such reasonable alternatives remains with government officials who have a
> unique understanding of, and a responsibility for, limited public resources,
> including a finite number of police officers.

496 U.S. at 453-54.   <u>See</u> <u>Illinois v. Lafayette</u>, 462 U.S. 640, 647 (1983)("[T]he reasonableness of

any particular government activity does not necessarily turn on the existence of alternative 'less

intrusive' means.").

In <u>United States v. Sokolow</u>, 490 U.S. 1 (1989), the Supreme Court examined the <u>Terry</u>[24]

stop of a suspected drug courier in an airport.   The Supreme Court rejected Sokolow's contention

that the arresting officers were "obligated to use the least intrusive means available to dispel their

suspicions that he was smuggling narcotics."   490 U.S. at 11.   Instead, the Supreme Court held:

"The reasonableness of the officer's decision to stop a suspect does not turn on the availability of

less intrusive investigatory techniques.   Such a rule would unduly hamper the police's ability to

make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."

<u>United States v. Sokolow</u>, 490 U.S. at 11 (internal quotations and citations omitted).   Similarly, in

---

[24]<u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit discussed when a police dog's use is objectively reasonable and whether the defendant Lehocky's actions violated "well established law enforcement standards."  It rejected the plaintiff's argument that certain testimony "should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994). Similarly, "violations of state law and police procedure generally do not give rise to a 1983 claim" for excessive force.  Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force).  Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."  Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [(10th Cir. 2002)]. Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052.

> Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez. In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cnty.

Comm'rs, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones." 28 F.3d at 1052 (internal quotations omitted).  See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)(citation omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment . . . .  Officers thus need not avail themselves of the least intrusive means of responding to exigent situations; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Garner v. Tennessee and Graham v. Connor.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative." Jonas v. Bd. of Comm'rs of Luna Cnty., 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.). See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable). See also Roy v. Inhabitants Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.).  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. at 647-48.  The Court has also rejected the consideration of a less intrusive alternative to end a threat. See Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## ANALYSIS

The Court first concludes that Chaves County is permitted to intervene both as of right and permissively, because no other remaining party adequately represents its substantial interest, and its defense shares a common question of fact and law with the existing parties.  Second, Bradshaw acted under color of law, because his conduct has a direct relationship to the performance of his public duties.  Third, Bradshaw is entitled to qualified immunity, because (i) although Bradshaw's

use of force was objectively unreasonable, (ii) Bradshaw did not violate Rosales' clearly established rights, because Rosales was armed with a firearm in his pants pocket when Bradshaw held him at gunpoint.  Last, because there are no remaining federal issues before the Court, it will remand this case, and the remaining state law claims of assault and battery, to Chaves County, Fifth Judicial District Court, New Mexico.

## I.      CHAVES  COUNTY  MAY  INTERVENE  BOTH  AS  OF  RIGHT  AND PERMISSIVELY.

Chaves County asks to intervene as of right or permissively under rules 24(a) or 24(b) of the Federal Rules of Civil Procedure.  See Motion to Intervene ¶¶  13-15, at 5-6.  Chaves County may intervene as of right, the Court concludes, because its Motion to Intervene is timely, its economic interest is substantial, denying intervention would very likely impair its ability to protect that interest, and, above all, no remaining party adequately represents that interest.   In the alternative, the Court concludes that Chaves County may intervene permissively, because defending its interest requires the resolution of common questions of law and fact shared with the parties already in the case.

### A.      CHAVES COUNTY CAN INTERVENE AS OF RIGHT, BECAUSE THE COURT  DISMISSED  SNYDER,  AND  NO  EXISTING  PARTY ADEQUATELY REPRESENTS ITS SUBSTANTIAL INTEREST.

Chaves County asks to intervene as of right.  See Motion to Intervene ¶ 13, at 5.  A movant can intervene under rule 24(a)(2)  by showing that: (i) the motion is timely; (ii) the movant asserts an interest related to the property or transaction which is the action's subject; (iii) the movant's interest relating to the property may be impaired or impeded; and (iv) existing parties do not adequately represent the movant's interest.  Fed. R. Civ. P. 24(a)(2); Elliott Indus. LP v. Am. Prod. Co., 407 F.3d at 1103.  "Under rule 24(a)(2), the intervenors must 'claim . . . an interest relating to the property or transaction which is the subject of the action.'"  Utah Ass'n of Cntys. v. Clinton,

255 F.3d at 1250 (quoting Fed. R. Civ. P. 24(a)(2)).  "The Tenth Circuit requires that the interest

be 'direct, substantial, and legally protectable.'"  Forest Guardians v. U.S. Dep't of Interior, 2004

WL 3426413, at *5 (D.N.M. Jan. 12, 2004)(Browning, J.)(quoting Utah Ass'n of Cntys. v. Clinton,

255 F.3d at 1250).   The movant bears the burden of establishing its right to intervene.  See

Brumfield v. Dodd, 749 F.3d 339, 341 (5th Cir. 2014); Barnes v. Sec. Life of Denver Ins. Co., 945

F.3d 1112 (10th Cir. 2019)(concluding that the applicant could intervene, because he had met his

burden on multiple elements).   The Court concludes that Chaves County can intervene as of right,

because: (i) the Motion to Intervene is timely; (ii) Chaves County has an interest, because it

potentially could be liable for Bradshaw's actions as a "public employee" under 42 U.S.C. § 1983;

(iii) denying intervention would impair Chaves County's ability to protect this interest; and (iv)

with the dismissal of claims against Snyder, no remaining parties adequately represent the

County's interest.

First, the Motion to Intervene is timely, because Chaves County filed the Motion to

Intervene only three days after Rosales filed his First Amended Complaint on July 24, 2020, and

this timing does not otherwise prejudice any of the parties.   "'[T]he timeliness of a motion to

intervene is assessed in light of all the circumstances, including the length of time since the

applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the

applicant, and the existence of any unusual circumstances.'"  Am. Ass'n of People with Disabilities

v. Herrera, 257 F.R.D. at 245 (quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1250).  In Utah

Ass'n of Cntys. v. Clinton, for example, intervention was timely, in part, because "no scheduling

order has been issued, no trial date set, and no cut-off date for motions set . . . .  [A]ll that had

occurred prior . . . were document discovery, discovery disputes, and motions by defendants

seeking dismissal on jurisdictional grounds."  255 F.3d at 1251.  Prejudice to existing parties,

meanwhile, "must be . . . caused by the movant's delay, not by the mere fact of intervention" or the additional work it imposes.  Okla. ex rel. Edmondson v. Tyson Foods, Inc., 619 F.3d at 1236 (citing Utah Ass'n of Cntys. v. Clinton, 255  F.3d at 1251).

The Court concludes that Chaves County filed its Motion to Intervene within a reasonable time frame, because only three days had passed since Rosales' had filed his First Amended Complaint on July 24, 2020, and intervention at that stage, before any other pleadings were filed, causes much less delay than the intervention in Utah Ass'n of Cntys. v. Clinton. 255  F.3d at 1251. Furthermore, any delay from the intervention does not prejudice unfairly Rosales or Bradshaw, because no trial date has been set, whereas denying or delaying intervention could potentially disadvantage Chaves County should the Court, in the course of the litigation, determine that Bradshaw acted within the scope of his duties.  See Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. at 245.

Second, as Bradshaw's employer at the time of the incident, Chaves County's interest in the case is "'direct, substantial, and legally protectable,'" because there is an economic threat if the Court concludes that Bradshaw acted under color of law and within the scope of his duties. Forest Guardians v. U.S. Dep't of Interior, 2004 WL 3426413, at *5 (D.N.M. Jan. 12, 2004)(Browning, J.)(quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1250).  "The threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest."  Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1115.  Here, Chaves County potentially would be liable for "any judgment and/or settlement of claims based on the commission of a tort or any violation of 42 U.S.C. § 1983 by a 'public employee'" of Chaves County, such as a Sheriff's Deputy acting within the scope of his or her duty.  Motion to Intervene ¶¶ 8-10, at 3-4 (citing N.M.S.A. §§ 41-4-3(G), -4(D), -20(A)(2), -23).  See Monell v. Dep't of Soc.

Servs., 436 U.S. 658 (1978); O'Farrell v. Bd. of Comm'rs for the Cnty. of Bernalillo, 455 F. Supp. 3d 1172 (D.N.M. 2020)(Browning, J.), appeal dismissed, No. 20-2070, 2020 WL 6885585 (10th Cir. June 11, 2020).

Third, Chaves County must show that a denial of its Motion to Intervene would risk impairing its ability to protect its interests. See WildEarth Guardians v. U.S. Forest Serv., 573 F.3d at 995. Here, if the Court concludes that Bradshaw acted within the scope of his duties, res judicata would bar Chaves County from raising that issue again at a later stage in defense of its own liability.[25] In other words, the Court's conclusion in this case would "foreclose the rights of the intervenor in later proceedings . . . through res judicata." Ute Distrib. Corp. v. Norton, 43 F. App'x at 279. Chaves County's economic interest is therefore neither remote nor speculative but rather directly "contingent upon the outcome of the litigation." San Juan Cnty. v. United States, 503 F.3d at 1203.

Fourth, Bradshaw argues that Snyder, in his official capacity as sheriff, adequately represents Chaves County's interest. The Court, however, dismissed Snyder on September 22, 2020. See Snyder Order at 1. The only remaining parties -- Bradshaw and Rosales -- stipulate that Bradshaw acted within the scope of his duties, contrary to Chaves County's interest. See First

_____

[25]Under New Mexico law, res judicata, also known as claim preclusion, bars re-litigation of "the same claim between the same parties or their privies when the first litigation resulted in a final judgment on the merits." Deflon v. Sawyers, 2006-NMSC-025, ¶ 2, 137 P.3d at 579. New Mexico law prescribes four elements for a party seeking to assert res judicata: "(i) the same parties or parties in privity; (ii) the identity of capacity or character of persons for or against whom the claim is made; (iii) the same subject matter; and (iv) the same cause of action in both suits." Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d 1278, 1285-86 (citing Apodaca v. AAA Gas Co., 2003-NMCA-085, ¶ 75, 73 P.3d 215, 238-39). These factors would all weigh against Chaves County challenging at a later date whether Bradshaw was acting within the scope of his duties under the NMTCA, because: (i) the parties would be the same; (ii) the challenge would involve the same "capacity or character of persons for or against whom the claim is made"; (iii) it would also relate to the "same subject matter"; and (iv) it would concern "the same cause of action." Hartnett v. Papa John's Pizza USA, Inc., 828 F. Supp. 2d 1278, 1285-86 (citing Apodaca v. AAA Gas Co., 2003-NMCA-085, ¶ 75, 73 P.3d 215, 238-39).

Amended Complaint ¶ 2, at 2; MTD Reply at 7.  No parties remain who can challenge adequately

that stipulation or, therefore, adequately represent Chaves County's interest.  Compared to the

existing parties' objectives, Chaves County's is far from "identical."  Bottoms v. Dresser Indus.,

Inc., 797 F.2d at 872-73.  The Court thus concludes that Chaves County has met its burden under

all four elements of intervention as of right.

> **B.      CHAVES COUNTY CAN INTERVENE PERMISSIVELY BECAUSE ITS DEFENSE CLAIMS SHARE A COMMON QUESTION OF FACT AND LAW WITH THOSE OF THE EXISTING PARTIES, AND INTERVENTION WILL NOT CAUSE DELAY.**

Chaves County argues in the alternative that it can intervene under rule 24(b).  See Motion

to Intervene ¶ 15, at 5-6.  The Court grants permissive intervention under rule 24(b) when: "(i) the

application to intervene is timely; (ii) the applicant's claim or defense and the main action have a

question of law or fact in common; and (iii) intervention will not unduly delay or prejudice the

adjudication of the original parties' rights."  Forest Guardians v.  U.S. Dep't of Interior,  2004 WL

3426413, at *10 (citing  Fed. R. Civ. P. 24(b)).  See Fed. R. Civ. P. 24(b)(3); DeJulius v. New Eng.

Health Care Emps. Pension Fund, 429 F.3d at 943 (noting that district courts are required to

consider undue prejudice or delay in deciding whether to grant permissive intervention); Am.

Ass'n of People with Disabilities v. Herrera, 257 F.R.D. at 259.  See also James W. Moore, 2

Moore's Manual: Federal Practice and Procedure, § 14.120[1] (LEXIS 2021)(explaining that

courts have discretion to determine "whether intervention will unduly delay or prejudice the

adjudication of the rights of the original parties").  Like under rule 24(a), the movant bears the

burden of establishing its right to intervene.  See Brumfield v. Dodd, 749 F.3d 339, 341 (5th Cir.

2014); Barnes v. Sec. Life of Denver Ins. Co., 945 F.3d 1112 (10th Cir. 2019)(concluding that the

applicant could intervene, because he had met his burden on multiple elements).

The Court concludes that, even if mandatory intervention under rule 24(a) is inappropriate,

permissive intervention is appropriate, because: (i) the Motion is timely; (ii) there is a common question of law or fact relevant to the claims of both Chaves County and the existing parties; and (iii) intervention will neither cause undue delay nor prejudice either of the original parties' rights. First, as the Court concludes above, see Analysis § I(A), supra, Chaves County's Motion is timely. Second, the Court agrees with Chaves County that "the facts . . . material to its claim are identical to many of the facts material to Plaintiff's substantive claims and . . . to some of the Defendant's defenses; and the law applicable to Plaintiff's claims for relief, too, shares a substantial nucleus of commonality." Motion to Intervene ¶ 16, at 5-6. Regardless of whether Chaves County has a substantial interest sufficient to meet its burden under rule 24(a), whether Bradshaw acted within the scope of his duties is a common question of law and fact that Chaves County shares with both parties. Third, because the litigation is still in its early stages and no party objects to the intervention on grounds of undue delay, the Court concludes that permitting intervention should neither cause undue delay nor prejudice either of the original parties' rights. Cf. Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. at 245 (concluding that intervention would cause undue delay "in a context where one month of voter-registration remains"). Denying the Motion to Intervene, on the other hand, would prejudice unfairly Chaves County and prevent it from representing its own interests over the litigation's course. The Court thus concludes that Chaves County has met its burden under rule 24(b) for permissive intervention.

## II.   BRADSHAW ACTED UNDER COLOR OF LAW, BECAUSE HIS CONDUCT HAD A DIRECT RELATIONSHIP TO THE PERFORMANCE OF HIS PUBLIC DUTIES.

No parties dispute that Bradshaw acted under color of state law.[26]   See First Amended

---

[26]Chaves County intervenes to argue that Bradshaw did not act within the scope his duties. See Sept. 8 Tr. at 6:13-15 (Dickman)(asserting that "if in fact Mr. Bradshaw did what he's alleged to have done, then that . . . was not within his scope of duties" under the NMTCA). See also Risk Mgmt. Div., Dep't of Fin. & Admin., State v. McBrayer, 2000-NMCA-104, ¶ 16, 14 P.3d 43, 48

Complaint ¶ 2, at 2; Sept. 23 Tr. at 13:14-21 (Court, Macke); Sept. 23 Tr. at 15:11-16 (Court, Dickman).  Nevertheless, conduct must occur under color of state law to satisfy the "jurisdictional requisite for a § 1983 action . . . ," Polk Cnty. v. Dodson, 454 U.S. at 315, and "the district court . . . can sua sponte question subject matter jurisdiction," Davis ex rel. Davis v. United States, 343 F.3d 1282, 1295 (10th Cir. 2003).  The Court therefore reviews whether Bradshaw's conduct fell under color of state law and concludes that Bradshaw acted under color of law, because his conduct had a direct relationship to the performance of his public duties.

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The under color-of-law determination rarely depends on a single, easily identifiable fact, such as the officer's attire . . . [but rather the] 'nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties.'" David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)). "[T]here must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493.  "[A] defendant in a § 1983 suit acts under color of state law when he abuses the position

---

(explaining that under the indemnification provision of the NMTCA, while criminal acts can still fall within a government employee's scope of duties, "the state would have a right to recover its expenditures . . . when it was free from fault.  Conversely, the state could not become indemnified against its employee, if it actually requested, required or authorized the performance of intentional, malicious, even criminal acts").  Whether Bradshaw acted within the scope his duties, however, has no bearing on whether he is entitled to qualified immunity from a § 1983 action, and thus it has no bearing on the MTD.  See 42 U.S.C. § 1983.  The Court instead limits its inquiry only to whether Bradshaw acted under color of state law, as required by § 1983 for liability arising from federal civil rights violations.  See Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).

given to him by the State." West v. Atkins, 487 U.S. at 50.  Under New Mexico law, a sheriff's official position as a state employee persists even when off-duty: "all sheriffs shall at all times be considered as in the discharge of their duties . . . ." N.M.S.A. § 4-41-10.  Deputies are no exception: "It is . . . the duty of every sheriff [and] deputy sheriff . . . to investigate all violations of the criminal laws of the state which are called to the attention of any such officer."   N.M.S.A. § 29-1-1.[27]  See Methola v. Eddy Cnty., 1980-NMSC-145, ¶ 17, 95 N.M. 329, 332, 622 P.2d 234, 237 (indicating the deputies' duties are the same as a sheriff's in holding that "the Eddy County sheriff [and] his deputies . . . were . . . 'law enforcement' officers within the meaning of [the NMTCA,] Section 41-4-3(D)").

The Tenth Circuit consistently has evaluated the circumstances' totality to determine whether an official has acted under color of law.  See David v. City & Cnty. of Denver, 101 F.3d at 1353 ("[O]ne must examine 'the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties.'")(quoting Martinez v. Colon, 54 F.3d at 986).  For example, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423 (10th Cir. 1984), cert. granted, judgment vacated and remanded for reconsideration on other grounds sub nom. in City of Lawton, Oklahoma v. Lusby, 474 U.S. 805 (1985), the Tenth Circuit found enough indicia of state action were present when an off-duty officer

> accosted [a shoplifting suspect], . . . flashed his badge and identified himself as a . . . police officer working as a security guard . . . , told [the suspected shoplifter] moments after he stopped him that he was going to jail . . . [and] went to the police station to finish his paperwork . . . [using] police documents to get information to complete the citizen's arrest forms.

749 F.2d at 1430.  The Tenth Circuit concluded that the off-duty officer was acting under color of

---

[27]The New Mexico Attorney General has similarly stated that "sheriffs are on duty at all times.  The same would be true of paid deputies even though their specific duties might be restricted."  1966 Op. Att'y Gen. No. 66-91.

law, because he "was acting as an on-duty police officer." Lusby v. T.G. & Y. Stores, Inc., 749

F.2d at 1429.  In contrast, off-duty officers who "used their status as members of the Gallup Police

Force to terrorize citizens," without evidence indicating they did so while "performing official

police duties," did not act under color of law but rather "within 'the ambit of personal pursuits.'"

Azua v. Overman, No. CIV 00-1397, 2001 WL 37124914, at *2-3 (D.N.M. Aug. 14,

2001)(Hansen, J.)(quoting Screws v. United States, 325 U.S. 91, 111 (1945)).

Other Courts of Appeals, such as the United States Court of Appeals for the Ninth Circuit,

have concluded, under the circumstances' totality, that an officer's off-duty status is not alone

dispositive.  Considering facts similar to Lusby v. T.G. & Y. Stores, Inc., the Ninth Circuit held

that an off-duty police officer, employed as a bank security guard, acted under color of law when

he identified himself as a police officer to a bank robbery suspect, drew his weapon, and detained

him.  See Traver v. Meshriy, 627 F.2d 934, 938 (9th Cir. 1980).  In Revene v. Charles Cnty.

Comm'rs, 882 F.2d 870 (4th Cir. 1989), the United States Court of Appeals for the Fourth Circuit

concluded that an off-duty officer's conduct could have been under color-of-law despite even

fewer indicia of state action, when the off-duty deputy followed the plaintiff's husband home,

pulled into his driveway, and shot him after an altercation, leading to his death. See 882 F.2d at

871.  The Fourth Circuit held that the plaintiff "might have been able to prove that [the deputy]

was acting under color of state law -- despite [the plaintiff's] admissions that [the deputy] was off

duty, out of uniform and driving his own vehicle."  Revene v. Charles Cnty. Comm'rs, 882 F.2d

at 873.

Here, like the off-duty officer in Lusby v. T.G. & Y. Stores, Inc., and unlike the officers'

in Azua v. Overman, Bradshaw acted not "within 'the ambit of personal pursuits,'" Azua v.

Overman, 2001 WL 37124914, at *3 (quoting Screws v. United States, 325 U.S. at 111), but rather

in performance of his official duties as a law enforcement officer.  His conduct was also similar to, and included more indicia of state action than, the off-duty deputy's conduct in Revene v. Charles Cnty. Comm'rs, because he: (i) called a fellow deputy to run Rosales' license plate and learn where Rosales lived, see First Amended Complaint ¶ 12, at 3; (ii) blocked Rosales' exit from his driveway, see First Amended Complaint ¶ 17, at 4, an "encounter . . . best . . . described as an investigative detention," United States v. Alvarado, 154 F. App'x 730, 732 (10th Cir. 2005)(unpublished);[28] (iii) identified himself as an officer to Rosales, see First Amended Complaint ¶ 23, at 4;  (iv) threatened Rosales with a reckless driving citation, see First Amended Complaint ¶¶ 23, 35, at 4-5; (v) stated he had contacted another officer, see First Amended Complaint ¶ 23, at 4; and (vi) accused Rosales' of illegally concealing his weapon, see First Amended Complaint ¶ 26, at 5.  Under the circumstances' totality, Bradshaw therefore was "acting as an on-duty police officer," Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1429, by enforcing the law and "exercise[ing] power 'possessed by virtue of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. at 326).  A "real nexus" thus exists between Bradshaw's use of his official authority and the allegation that he abused this authority by using excessive force.  Jojola v. Chavez, 55 F.3d at 493.  The Court concludes therefore that Bradshaw acted under color of state law.

## III.   BRADSHAW IS ENTITLED TO QUALIFIED IMMUNITY, BECAUSE, ALTHOUGH BRADSHAW USED EXCESSIVE FORCE, HE DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is

---

[28]Where a suspect "was not free to leave . . . while the officers blocked his car, this encounter would best be described as an investigative detention." United States v. Alvarado, 154 F. App'x 730, 732 (10th Cir. 2005)(unpublished).  In this case, both parties stipulate that Bradshaw's conduct effected an investigative stop because Rosales was not free to leave.  See Response to MTD at 10; Sept. 23 Tr. at 7:11-23 (Court, Macke); Sept. 23 Tr. at 25:4-18 (Newell).

required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d at 1128.  The Court concludes, taking the allegations in the First Amended Complaint as true, that: (i) Bradshaw's decision to draw and aim a gun at Rosales, who did not pose a threat, is objectively unreasonable; but (ii) an objectively reasonable officer could not have thought that holding Rosales at gunpoint under the circumstances violated clearly established constitutional protections.

### A.   BRADSHAW VIOLATED ROSALES' CONSTITUTIONAL RIGHTS, BECAUSE HOLDING ROSALES AT GUNPOINT IS OBJECTIVELY UNREASONABLE UNDER THE CIRCUMSTANCES.

The Court evaluates Rosales' excessive force claim under the Fourth Amendment's objective reasonableness standard, where the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396 (quoting Terry v. Ohio, 392 U.S., at 20-22).  Under this standard, the Court must "careful[ly] balanc[e] . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. at 7).  "The ultimate question 'is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'"  Casey v. City of Fed. Heights, 509 F.3d at 1281 (quoting Graham v. Connor, 490 U.S. at 397).  To determine if an officer's actions are objectively reasonable, the Court considers the circumstances' totality, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. at 396.  An "'[a]ssessment of the degree of force

actually used is critical to the question of whether the force was excessive.'" Perea v. Baca, 817 F.3d at 1202 (quoting Grauerholz v. Adcock, 51 F. App'x 298, 300 (10th Cir. 2002)(unpublished)).

Rosales alleges that Bradshaw used excessive force when Bradshaw: (i) followed Rosales home in an unmarked vehicle and blocked Rosales in his driveway, see First Amended Complaint ¶¶ 7-18, at 3-4; (ii) "yell[ed] and curs[ed] at . . . Rosales in a loud, threatening, and abusive manner," First Amended Complaint ¶ 19, at 4; (iii) "identified himself as Officer Bradshaw and threatened Rosales with a reckless driving citation," First Amended Complaint ¶ 23, at  4; (iv) drew his revolver and "point[ed] it at Rosales in a threatening manner," First Amended Complaint ¶ 24, at 5; and (iv) "purposefully raised his gun at Rosales in a manner that made him fear he was about to be shot by Bradshaw," First Amended Complaint ¶ 26, at 5.  Bradshaw argues that his actions were objectively reasonable, because Rosales had a visible gun in his pocket and walked down his driveway towards Bradshaw until Bradshaw drew his gun and told him to stop.  See MTD at 3-5.  Both parties cite Holland as the operative Tenth Circuit decision governing whether an officer pointing a firearm at a person constitutes excessive force.  See MTD at 4 (citing Holland); Response at 6-7 (citing Holland).  The sheriff in Holland sent a SWAT team to execute search and arrest warrants for a suspect at the suspect's family compound.  268 F.3d at 1191.  The officers thought some of the compound residents had violent criminal histories and "knew in advance that . . . children would be present."  Holland, 268 F.3d at 1191-92.  During the ensuing search,

> the SWAT deputies held each of the [bystander children and two others] at gunpoint, initially forcing several of them to lie down on the ground for ten to fifteen minutes, and ultimately gathering all of them in the living room of the residence where they were held until all but [the original suspect] were released.

Holland, 268 F.3d at 1192.  The Tenth Circuit concluded that the officers violated the Fourth Amendment, because: (i) the "display of weapons, and the pointing of firearms directly at persons

inescapably involves the immediate threat of deadly force . . . [which] should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time"; (ii) "where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person"; and (iii) "[p]ointing a firearm directly at a child calls for even greater sensitivity to . . . what may be excessive under all the circumstances." Holland, 268 F.3d at 1192-93.

Bradshaw's actions, like the officers in Holland who pointed weapons at nonthreatening bystanders, "inescapably involve[] the immediate threat of deadly force," and thus "should be predicated on at least a perceived risk of injury or danger to the officers or others." 268 F.3d at 1192. Bradshaw frames the Tenth Circuit's holding in Holland as "address[ing] . . . whether the continual pointing of a firearm at a child violates the Fourth Amendment," thereby distinguishing it because Rosales "is an adult, not a child." MTD at 4. The Court disagrees with this narrow interpretation of Holland. That the presence of children in Holland required "even greater sensitivity" necessarily implies that, in all other cases, some minimal level of sensitivity is required before officers use the "threat of deadly force." 268 F.3d at 1192. The deadly force threat, therefore, is predicated not on the narrow question of a suspect's age but more broadly "on at least a perceived risk of injury or danger to the officers or others." 268 F.3d at 1192. The first question, therefore, is whether Bradshaw's conduct meets Holland's minimum requisite level of sensitivity. Here, while not causing the same physical pain as the repeated application of a Taser weapon in Cavanaugh v. Woods Cross City, 625 F.3d at 665, putting Rosales under the threat of deadly force and in imminent fear for his life "unquestionably 'seizes' the victim in an abrupt and violent manner." 625 F.3d at 665 (add a parenthetical). See Holland, 268 F.3d at 1195 ("[T]he interests

protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests -- a person's 'sense of security' and individual dignity."). The Court therefore concludes that, just like the seizures' nature and quality both in Holland, 268 F.3d at 1195, and in Cavanaugh v. Woods Cross City, 625 F.3d at 665, "the 'nature and quality'" of Bradshaw's "intrusion" on Rosales' Fourth Amendment protections "was quite severe," Cavanaugh v. Woods Cross City, 625 F.3d at 665, because Rosales had good reason to fear for his life when Bradshaw, who had followed him home in an unmarked vehicle and was not in uniform, pointed a revolver at him in a threatening manner.

> **1.   None of the Graham v. Connor Factors Justify Bradshaw's Threat of Deadly Force.**

Because Bradshaw pulled out a revolver and pointed it at Rosales in a threatening manner, see First Amended Complaint ¶ 24, at 5, actions that "inescapably involve[] the immediate threat of deadly force," Holland, 268 F.3d at 1192, the Court analyzes whether Bradshaw's use of force was objectively reasonable. Consistent with the Supreme Court in Graham v. Connor, 490 U.S. at 396, the Tenth Circuit analyzes three factors to determine whether an officer's use of force is objectively reasonable: (i) the crime's severity; (ii) whether the suspect poses an immediate threat to the safety of the officers or of others; and (iii) whether the suspect actively is resisting arrest or is attempting to evade arrest by flight. See Graham v. Connor, 490 U.S. at 396; Weigel v. Broad, 544 F.3d at 1143; Holland, 268 F.3d at 1192-93. The Court concludes that all three factors weigh against Bradshaw and that Bradshaw's decision to point a firearm at Rosales in a threatening manner is objectively unreasonable, because: (i) Rosales' alleged crime is only a petty misdemeanor; (ii) Rosales' initial approach towards Bradshaw's vehicle with a gun in his pocket did not pose a reasonable threat under the circumstances; and (iii) at no point was Rosales resisting or evading arrest.

a.   **The First Graham v. Connor Factor Weighs Against Bradshaw, Because Rosales' Alleged Traffic Misdemeanor Justifies at Most a Minimal Use of Force.**

The first factor, the severity of Rosales' crime -- a petty misdemeanor -- weighs heavily against the use of anything more than minimal force or any force at all.   Cf. Fisher v. City of Las Cruces, 584 F.3d 888, 895 (10th Cir. 2009)(noting that an officer was justified using only minimal, if any force, to detain a person for a petty misdemeanor).   Bradshaw states that he followed Rosales to his home to give him a citation for reckless driving.   See First Amended Complaint ¶ 23, at 4. Rosales alleges that he "decided to pass Bradshaw to which Bradshaw apparently took great offense" and he started making turns without using his turn signal after he realized Bradshaw was following him.   First Amended Complaint ¶¶ 9-11, at 3.   See N.M.S.A. § 66-8-113(A)(defining reckless driving as "[a]ny person who drives any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property.").   As the Court has noted, officers may not use the same level of force "to arrest a submissive misdemeanant" as they "may use to apprehend a fleeing felon."   Favela v. City of Las Cruces ex rel. Las Cruces Police Dep't, 398 F. Supp. 3d at 919 (citing Casey v. City of Fed. Heights, 509 F.3d at 1282).   See Perea v. Baca, 817 F.3d at 1203 ("Although the officers are correct that an officer can effect an arrest for even a minor infraction, [the plaintiff's] minor offense -- at most -- supported the use of minimal force."); Fogarty v. Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2008)(concluding that, because the detainee had committed only a petty misdemeanor, "the amount of force used should have been reduced accordingly").   Accordingly, because reckless driving is a petty misdemeanor in New Mexico, see State v. Trevizo, 2011-NMCA-069, ¶ 19, 150

N.M. 158, 257 P.3d 978, 983;[29] Pauly v. White, 874 F.3d 1197, 1215 (10th Cir. 2017)("Under New Mexico law, reckless driving . . . [is a] misdemeanor offense[]."), cert. denied, 138 S.Ct. 2650 (2018), using anything more than minimal force against Rosales was unreasonable.  The Court concludes, therefore, that the first factor from Graham v. Connor, 490 U.S. at 396, weighs heavily against the reasonableness of Bradshaw's initial decision to threaten deadly force by "pointing [his revolver] at Rosales in a threatening manner."  First Amended Complaint ¶ 24, at 5.

In addition to the alleged traffic misdemeanor, Bradshaw accused Rosales, during the encounter, of having a concealed carry, because "the wind blew Rosales' shirt over his firearm." First Amended Complaint ¶¶ 25, 26, at 5.  In New Mexico, a concealed handgun is "a loaded handgun that is not visible to the ordinary observations of a reasonable person."  N.M.S.A. § 29-19-2(D).  Although New Mexico defines the "[u]nlawful carrying of a deadly weapon [as] . . . carrying a concealed loaded firearm or any other type of deadly weapon anywhere," N.M.S.A. § 30-7-2(A), it also provides an exception when the suspect is "on real property belonging to [the suspect] as owner, lessee, tenant or licensee," N.M.S.A. § 30-7-2(A)(1).  First, Rosales' firearm must have originally been "visible to the ordinary observations of a reasonable person," N.M.S.A. § 29-19-2(D), because shortly after Rosales exited his car, "Bradshaw began making remarks about Rosales' handgun," First Amended Complaint ¶ 21, at 4.  Second, even if the Court concluded that the shirt blowing over Rosales' firearm converted his open carry into a concealed one, Bradshaw knew Rosales was on his own property, because, "[w]hile pursuing  Rosales, Bradshaw called a

---

[29]The Court predicts that the Supreme Court of New Mexico would agree with State v. Trevizo, because it cites the Court of Appeals of New Mexico case favorably in New Mexico v. Armijo, 2016-NMSC-021, ¶ 16, 375 P.3d 415, 419.  The Court has relied on State v. Trevizo.  See United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1336 (D.N.M. 2012)(Browning, J.)("In State v. Trevizo . . . the Court of Appeals of New Mexico . . . found that the New Mexico Legislature set the penalties for 'violations of the Motor Vehicle Code to be consistent with the classification of petty misdemeanors found in the Criminal Code.'").

fellow deputy," who linked Rosales' license plates to the residence where the incident later occurred and "advised Bradshaw it appeared Rosales was heading home."   First Amended Complaint ¶ 12, at 3.   The Court therefore concludes, first, that it was unreasonable to accuse Rosales of unlawfully having a concealed carry, because, "Rosales . . . remain[ed] in his driveway."  First Amended Complaint ¶ 22, at 4.  See United States v. Rodriguez, 739 F.3d 481, 490–91 (10th Cir. 2013)(finding "a readily apparent exception to subsection (A)'s prohibition" would negate reasonable suspicion that a suspect is violating N.M.S.A. § 30-7-2(A)).   Second, under New Mexico law, "whoever commits unlawful carrying of a deadly weapon is guilty of a petty misdemeanor."  N.M.S.A. § 30-7-2(C).  The Court concludes, therefore, that, even if Rosales had concealed unlawfully his weapon, only the minimal use of force, at most, would be justified. See Favela v. City of Las Cruces ex rel. Las Cruces Police Dep't, 398 F. Supp. 3d at 919.  The first factor weighs heavily against Bradshaw when he "purposefully raised his gun at Rosales in a manner that made him fear he was about to be shot."  First Amended Complaint ¶ 26, at 5.

> **b.     The Second Graham v. Connor Factor Weighs Against Bradshaw, Because Rosales' Cautious Actions Did Not Pose a Reasonable Threat to Bradshaw or Others.**

The Tenth Circuit explains that "the second Graham factor, 'whether the suspect pose[s] an immediate threat to the safety of the officers or others,' 490 U.S. at 396 . . . , is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force."  Pauly v. White, 874 F.3d at 1215-16 (quoting Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010)).   The Tenth Circuit uses a number of non-exclusive factors to evaluate a suspect's threat level, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the

suspect; and (4) the manifest intentions of the suspect." Est. of Larsen v. Murr, 511 F.3d at 1260.

In assessing the third of these factors, the Tenth Circuit emphasizes that distance must be considered under the circumstances' totality as "but one factor of many" and not subject to "a *per se* rule where distance alone would create a fact question as a matter of law." Est. of Larsen v. Murr, 511 F.3d at 1262. See Zia Tr. Co. v. Montoya, 597 F.3d 1150, 1155 (10th Cir. 2010)("[W]e have never laid down a per se rule regarding distance."). In other words, depending on the circumstances, no "particular distance makes the use of force unreasonable." Est. of Larsen v. Murr, 511 F.3d at 1262. In addition to the Estate of Larsen v. Murr factors, the Tenth Circuit also considers the extent to which an officer's conduct leading up to the use of force provokes a suspect's actions, thereby creating the subsequent need to use force. See, e.g., Pauly v. White, 874 F.3d at 1220; Allen v. Muskogee, Okl., 119 F.3d 837, 840 (10th Cir. 1997); Bella v. Chamberlain, 24 F.3d at 1256, 1256 n.7; Romero v. Bd. of Cnty. Comm'rs, 60 F.3d at 705 n.5. The Court first considers the Estate of Larsen v. Murr and then turns to whether Bradshaw's conduct leading up to the use of force provoked Rosales' actions. The Court concludes these factors weigh heavily against the reasonableness of Bradshaw's perception that Rosales posed a threat under the second factor of Graham v. Connor, 490 U.S. at 396.

### i. The Estate of Larsen v. Murr Factors

The Estate of Larsen v. Murr, 511 F.3d at 1260, factors weigh against Bradshaw. Regarding the first factor -- whether the officer ordered the suspect to drop his weapon and the suspect's compliance with police commands -- Rosales did not fail to comply with Bradshaw's commands at any point during the incident. See First Amended Complaint ¶¶ 17-31, at 4-5. Indeed, Rosales intentionally "ke[pt] his hands clear of his firearm" while speaking reasonably with Bradshaw, First Amended Complaint ¶ 22, at 4, and he did not touch his firearm until

Bradshaw ordered him to put the firearm in his vehicle, see First Amended Complaint ¶ 30, at 5. Bradshaw, on the other hand, "yell[ed] and curs[ed] at . . . Rosales in a loud, threatening, and abusive manner," First Amended Complaint ¶ 19, at 4, and then "continued to yell at Rosales in an angry and threatening manner," First Amended Complaint ¶ 20, at 4, all before identifying himself clearly as an officer, see First Amended Complaint ¶ 23, at 4. In instances where officers use harsh language, "[w]hile it seems unlikely that harsh language alone would render a search or seizure 'unreasonable,' verbal abuse may be sufficient to tip the scales in a close case." Holland, 268 F.3d at 1194 (no citation for quotation). Bradshaw's language, just like the harsh language law enforcement used in Holland, 268 F.3d at 1194, rather than issuing "[s]imple instructions spoken in a firm, commanding tone of voice [to] communicate clearly what an officer wants a subject to do," instead "communicate[d] very little of substance beyond the officer's own personal animosity, hostility or belligerence." Holland, 268 F.3d at 1194. The Court therefore concludes that the first factor weighs against Bradshaw, because Rosales complied with Bradshaw's orders, and even though Bradshaw "yell[ed] at Rosales in an angry and threatening manner," Rosales did not touch his weapon. First Amended Complaint ¶ 20, at 4. See First Amended Complaint ¶¶ 17-31, at 4-5.

Second -- whether any hostile motions were made with the weapon towards the officer -- Rosales made no hostile motions, because he kept his hands away from his firearm, and he did not touch his firearm until Bradshaw ordered him to put it in his vehicle. See First Amended Complaint ¶¶ 22-30, at 4-5. Cf. Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1319 (10th Cir. 2009)(finding a suspect "made hostile motions [when] he aimed his weapon at the officers after having previously stated that he was going to pull the trigger"). Bradshaw argues that there was "a reasonable threat of danger or violence to" him when Rosales, with his gun visible in his pants

pocket, moved towards him.  See MTD at 5.  Bradshaw also argues that "[t]here are no allegations that Mr. Bradshaw displayed his weapon at all after Plaintiff put his own gun back in his vehicle." MTD at 4.  Although Rosales moved "a little closer" to Bradshaw along his driveway when Bradshaw blocked him, he did so without touching or reaching toward his gun, or otherwise making any hostile motions with his gun.  First Amended Complaint ¶ 22, at 4.  He instead "remain[ed] in his driveway and . . . k[ept] his hands clear of his firearm" while "attempt[ing] to talk in a normal tone of voice."  First Amended Complaint ¶ 22, at 4.  Further, Rosales "attempted to speak reasonably with Bradshaw," and "explained to Bradshaw that New Mexico is an open carry state and he simply was exercising his rights and that he was on his own private property." First Amended Complaint ¶¶ 20-22, at 4.  Contrary to Bradshaw's assertion, before Bradshaw ordered Rosales to put his firearm in his vehicle, "Bradshaw pulled a revolver and was holding it in his hand and was pointing it at Rosales in a threatening manner,"  First Amended Complaint ¶ 24, at 4, and when wind blew Rosales' shirt over his firearm, "Bradshaw yelled, 'now that's concealed carry' and purposefully raised his gun at Rosales in a manner that made him fear he was about to be shot by Bradshaw," First Amended Complaint ¶ 26, at 5.  The Court concludes that Rosales did not pose a threat by walking down his driveway towards an out-of-uniform Bradshaw, even though he had a firearm in his pocket with the "handle of the gun visible and openly displayed," First Amended Complaint ¶ 18, at 4, because Rosales was calm, kept his hands away from his firearm, and tried to reason with Bradshaw.  Because Rosales used his gun in a hostile manner, the second factor weighs against Bradshaw's decision to threaten deadly force.

The third factor -- the distance separating the officers and the suspect -- weighs slightly in Bradshaw's favor, because, although Rosales was initially walking down his driveway towards Bradshaw: (i) distance is "but one factor of many" under the circumstances' totality and is not

subject to any *per se* rule," <u>Est. of Larsen v. Murr</u>, 511 F.3d at 1262; (ii) Rosales moved only a "little closer"; (iii) the exact distance between Bradshaw and Rosales is unclear; and (iv) Rosales' firearm was in his pocket, <u>see</u> First Amended Complaint 17, 22, 31 at 4-5.  The Court recognizes that a person who moves down a driveway towards an officer with a firearm in his pocket could pose a threat from the perspective of a reasonable officer under certain circumstances.  <u>See</u>, <u>e.g.</u>, <u>Est. of Valverde v. Dodge</u>, 967 F.3d 1049, 1065 (10th Cir. 2020)(finding the availability of cover behind a vehicle irrelevant where a hostile suspect holding a firearm "could have taken three or four steps around the hood of the car and shot the crouching [officer] at close range"); <u>Estrada v. City of Las Cruces</u>, No. CIV 09-10 RB/CG, 2010 WL 11626773, at *5 (D.N.M. Jan. 12, 2010)(Brack, J.)("When a suspect is wielding a gun, the danger . . . is more immediate because [the officer] can be struck from a greater distance than with a knife.").  Although Rosales had a firearm, it was in his pants pocket, so the threat was not as immediate as a suspect who is holding the weapon.  <u>See Est. of Valverde v. Dodge</u>, 967 F.3d at 1065; <u>Estrada v. City of Las Cruces</u>, 2010 WL 11626773, at *5.  The Court concludes, therefore, that the third factor weighs slightly in Bradshaw's favor.

Under the fourth factor --  assessing the suspect's manifest intentions -- Bradshaw contends that Rosales posed a reasonable threat of danger or violence to him, because he "emerge[d] from his vehicle with a weapon" and "approached Mr. Bradshaw's vehicle with a firearm."  MTD at 5, 6.  Bradshaw reiterated at the hearing on September 23 that, "at the time Mr. Bradshaw identifies and aims his firearm at Mr. Rosales, Mr. Rosales is approaching him with a weapon."  Sept. 23 Tr. at 6:13-15 (Macke).  He later emphasized, once again, that when Bradshaw pointed his firearm, the "Plaintiff was still armed and walking toward Mr. Bradshaw."  Sept. 23 Tr. at 10:17-18 (Macke).  Chaves County agreed with Bradshaw: "[W]hen [Bradshaw] pulled the gun [Rosales]

was walking toward him." Sept. 23 Tr. at 33:22-23 (Dickman). Based on this construction of the facts, therefore, Bradshaw argues that "the act of pointing a firearm at an individual who is himself armed and approaching a vehicle [does not] violate the Fourth Amendment." MTD at 3.[30]

The Court concludes that Rosales' intentions were not hostile; rather, "Rosales attempted to speak reasonably with Bradshaw"; "ke[pt] his hands clear of his firearm"; continued to "try[] to reason with [Bradshaw]"; and "walked a little closer to . . . Bradshaw's truck in an attempt to talk in a normal tone of voice." First Amended Complaint ¶¶ 20-22, 29, at 4, 5. Rosales also deliberately "explained . . . that New Mexico is an open carry state and he simply was exercising his rights and that he was on his own private property," and "remain[ed] in his driveway." First Amended Complaint ¶¶ 21, 22, at 4. Rosales stayed calm throughout the encounter even though Bradshaw dramatically escalated the situation by "purposefully rais[ing] his gun at Rosales in a manner that made him fear he was about to be shot by Bradshaw," when the wind blew Rosales' shirt over his firearm, First Amended Complaint ¶ 26, at 5. Further, Bradshaw should not have been "surprise[d]," Pauly v. White, 874 F.3d at 1219, that Rosales decided to arm himself, after an unmarked car followed him home and blocked him in his driveway. See First Amended Complaint ¶¶ 7-18, at 3-4; id. ¶ 18, at 4 ("Rosales became afraid to exit his vehicle and before he did so, he grabbed his handgun from his car and tucked the barrel of his handgun in his pants

---

[30]The Court notes that the well-pleaded facts reasonably support the inference that Rosales was no longer, in fact, approaching Bradshaw's truck when Bradshaw decided to draw his weapon. First, Rosales alleges he only moved "a little closer." First Amended Complaint ¶ 22, at 4. Second, this approach had likely ceased altogether before Bradshaw pulled his weapon, because: if (i) Rosales could understand and be heard by Bradshaw, see First Amended Complaint ¶ 23, at 4; then (ii) he no longer needed to "walk[] a little closer . . . in an attempt to talk in a normal tone of voice," First Amended Complaint ¶ 22, at 4. Even if Rosales was still closing the distance between himself and Bradshaw when Bradshaw decided to use the threat of deadly force, as both Bradshaw and Chaves County assert, the Court concludes that Rosales' decision to move "a little closer" in a non-threatening manner still did not manifest hostile intent in light of the rest of Rosales' actions and the circumstances' totality.

pocket leaving the handle of the gun visible and openly displayed."). The Tenth Circuit reasoned in Pauly v. White:

> [U]nder the version of events that plaintiffs present, it was no surprise that the brothers armed themselves . . . because it was their constitutional right to do so: "[T]he inherent right of self-defense has been central to the Second Amendment right . . . ." District of Columbia v. Heller, 554 U.S. 570, 628-29 . . . (2008) . . . . [V]iewing the facts in the light most favorable to plaintiffs, the manifest intention of the brothers was to protect their home after inadequate identification from the officers, which was their legal right.

Pauly v. White, 874 F.3d at 1219. Bradshaw's first indication that Rosales was not treating the incident like a normal traffic stop, but rather was evading an unknown pursuer in fear, was after "Bradshaw began to follow Rosales," and "Rosales . . . made a series of turns without using his turn signal to determine if Bradshaw was following him." First Amended Complaint ¶¶ 10, 11, at 3. When Rosales put his gun in his pants pocket and exited his vehicle, it was still in the context of an unknown, unofficial pursuer. See First Amended Complaint ¶ 18, at 4. If the Court views the evidence in the light most favorable to Rosales, Rosales acted cautiously and reasonably, and not hostilely, and his intentions were to learn why an unidentified and aggressive person had followed him home, and blocked his driveway. The Court concludes, therefore, that the fourth factor weighs heavily against Bradshaw. Because three of the four Estate of Larsen v. Murr factors weigh against Bradshaw, the Court concludes that the second Graham v. Connor factor weighs against Bradshaw.

### ii.     Bradshaw's Conduct Before Seizing Rosales Prompted Rosales to Take Precautionary Steps.

When evaluating the second Graham v. Connor factor, the Tenth Circuit also considers, in addition to the Estate of Larson v. Murr factors, the degree to which an officer's conduct leading to the use of force that provoked a suspect's defensive actions and thus created the need to use force. See, e.g., Pauly v. White, 874 F.3d at 1220 (considering the "reckless conduct of the officers

in effecting the seizure" in addition to the Estate of Larson v. Murr factors); Allen v. Muskogee, Okl., 119 F.3d at 840; Bella v. Chamberlain, 24 F.3d at 1256 & n.7; Romero v. Bd. of Cnty. Comm'rs, 60 F.3d at 705 n.5. "The reasonableness of [the officers'] actions depends [not only] on whether the officers were in danger at the precise moment that they used force [but also] on whether [the officers'] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Sevier v. City of Lawrence, Kan., 60 F.3d 695, 699 (10th Cir. 1995). "Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure is reasonable." Bella v. Chamberlain, 24 F.3d 1251, 1256 & n.7 (10th Cir. 1994). In Pauly v. White, the Tenth Circuit explains:

> We will "consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force." Allen [v. Muskogee, Okl.], 119 F.3d [837,] 840 [(10th Cir. 1997)](quoting Romero v. Bd. of Cnty. Comm'rs, 60 F.3d 702, 705 n.5 (10th Cir. 1995)); cf. [Tennessee v.] Garner, 471 U.S. [1,] . . . 8 [(1985)]("[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out."). The officer's conduct prior to a suspect threatening force "is only actionable if it rises to the level of recklessness." Thomson [v. Salt Lake Cnty.], 584 F.3d [1304,] . . . 1320 [(10th Cir. 2009)]. Thus, "[m]ere negligen[ce]" will not suffice. Sevier, 60 F.3d at 699 n.7.

Pauly v. White, 874 F.3d at 1220. In Pauly v. White, officers approached the plaintiffs' house at night, made threatening statements, and did not properly announce their official status as law enforcement. 874 F.3d at 1204-05. The Tenth Circuit held that the subsequent shooting of a plaintiff was excessive, in part because the officers' "reckless actions . . . were . . . immediately connected to the [plaintiffs] arming themselves," and "the threat made by the [plaintiffs], which would normally justify an officer's use of force, was precipitated by the officers' own actions." Pauly v. White, 874 F.3d at 1221.

Here, in response to only a suspected misdemeanor traffic violation, Bradshaw: (i) while off-duty; (ii) in an unmarked personal vehicle; (iii) and not in uniform; (iv) followed Rosales; (v)

even after "Rosales . . . made a series of turns without using his turn signal to determine if Bradshaw was following him"; (vi) blocked Rosales in his driveway with his vehicle; and (vii) when Rosales exited his vehicle, "Bradshaw immediately started yelling and cursing at . . . Rosales in a loud, threatening, and abusive manner." First Amended Complaint ¶¶ 8, 10, 11, 17, 31, at 3-5. Bradshaw's "prior conduct . . . is 'immediately connected' to" Rosales taking precautions against an unknown pursuer who followed him home, Pauly v. White, 874 F.3d at 1220 (quoting Allen v. Muskogee, Okl., 119 F.3d at 840), because, right after Bradshaw blocked Rosales' exit from his driveway, "Rosales became afraid to exit his vehicle and before he did so, he grabbed his handgun from his car and tucked the barrel of his handgun in his pants pocket leaving the handle of the gun visible and openly displayed," First Amended Complaint ¶¶ 17, 18, at 4. Next, after Rosales' exited his vehicle, "Bradshaw immediately started yelling and cursing at . . . Rosales in a loud, threatening, and abusive manner," without identifying himself as an officer. First Amended Complaint ¶ 19, at 4. Then, when "Rosales attempted to speak reasonably with Bradshaw[,] . . . Bradshaw continued to yell at Rosales in an angry and threatening manner." First Amended Complaint ¶ 20, at 4. By escalating the conflict, Bradshaw again disregarded a substantial risk that Rosales could respond in kind. Bradshaw's conduct therefore led Rosales to then "walk[] a little closer to . . . Bradshaw's truck in an attempt to talk in a normal tone of voice." First Amended Complaint ¶ 22, at 4. See Pauly v. White, 874 F.3d at 1220; Allen v. Muskogee, Okl., 119 F.3d at 840; Bella v. Chamberlain, 24 F.3d at 1256 & n.7; Romero v. Bd. of Cnty. Comm'rs, 60 F.3d at 705 n.5. The Court concludes, therefore, that, even if Rosales' actions posed a reasonable threat to Bradshaw, the second Graham v. Connor factor still would weigh against Bradshaw, because his own conduct prompted Rosales to put his firearm in his pocket and walk down his driveway. See Pauly v. White, 874 F.3d at 1220-21.

c. **The Third <u>Graham v. Connor</u> Factor Weighs Against Bradshaw, Because Rosales Was Not Resisting or Evading <u>Arrest.</u>**

Under the third <u>Graham v. Connor</u> factor, the Court considers the extent to which Rosales was resisting or evading arrest.   <u>See</u> 490 U.S. at 396.   The Court concludes that Rosales neither was "actively resisting arrest" nor was "attempting to evade arrest by flight," <u>Graham v. Connor</u>, 490 U.S. at 396; rather Rosales stayed calm, remained in his driveway, and, after Bradshaw identified himself as an officer, complied with Bradshaw's commands, <u>see</u> First Amended Complaint ¶¶ 18-30, at 4-5.   After Bradshaw arrived at Rosales' residence and blocked the driveway with his truck, "preventing Rosales from leaving his driveway," Rosales exited his vehicle with "his handgun in his pants pocket . . . [with] the handle of the gun visible and openly displayed."   First Amended Complaint ¶¶ 17-18, at 4.   Bradshaw did not identify himself immediately as an officer, and, after Bradshaw "started yelling and cursing at . . . Rosales in a loud, threatening, and abusive manner," Rosales walked towards Bradshaw, "while remaining in his driveway and while keeping his hands clear of his firearm, . . . in an attempt to talk in a normal tone of voice."   First Amended Complaint ¶¶ 19-22, at 4.  Only then did Bradshaw identify himself as an officer and state that he was going to cite Rosales for reckless driving.   <u>See</u> First Amended Complaint ¶¶ 19-22, at 4.   During this exchange, Bradshaw pulled out his revolver, holding it in a threatening manner, and when a gust of wind blew Rosales' shirt over his firearm, "Bradshaw yelled, 'now that's concealed carry' and purposefully raised his gun at Rosales in a manner that made him fear he was about to be shot by Bradshaw."   First Amended Complaint ¶¶ 24-26, at 5.   At that point, Rosales placed his hands in the air, moved away from Bradshaw, and placed his gun in his car after Bradshaw asked him to place it there.   <u>See</u> First Amended Complaint ¶¶ 27-30 at 5.   All these facts show that Rosales did not resist arrest or attempt to flee, but, rather, that he stayed

calm and was willing to comply with Bradshaw's demands after Bradshaw identified himself as an officer.  The Court therefore concludes the third factor of Graham v. Connor, 490 U.S. at 396, weighs against Bradshaw.

In sum, the Court concludes that three Graham v. Connor factors weigh against Bradshaw, because, at all times of the incident, Rosales: (i) had committed only, at most, a misdemeanor; (ii) did not pose a reasonable threat to Bradshaw, or others, under the circumstances; and (iii) did not flee or resist arrest, but calmly tried to reason with Bradshaw.  Bradshaw's actions neither are reasonable nor are proportionate when he "pull[ed] . . . h[eld] . . . [and] point[ed]" a revolver at "Rosales in a threatening manner," First Amended Complaint ¶ 24, at 5, and "in a manner that made him fear he was about to be shot," First Amended Complaint ¶ 26, at 5.  Further, Bradshaw's conduct leading up to the incident prompted Rosales to take precautions in response to an unidentified pursuer.  See First Amended Complaint ¶¶ 18-30, at 4-5.  The Court therefore concludes that Bradshaw's threat of deadly force was excessive and not objectively reasonable.

**B.    BRADSHAW NEVERTHELESS IS ENTITLED TO QUALIFIED IMMUNITY, BECAUSE HE DID NOT VIOLATE ANY OF ROSALES' CLEARLY ESTABLISHED RIGHTS, AND HIS CONDUCT WAS NOT PARTICULARLY EGREGIOUS.**

Qualified immunity shields police officers when they are "'forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'"  Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018)(quoting Graham v. Connor, 490 U.S. at 396-97).  Qualified immunity thus "operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force.'"  Saucier v. Katz, 533 U.S. at 206 (quoting Priester v. Riviera Beach, 208 F.3d 919, 926-927 (11th Cir. 2000)).  Accordingly, even where an officer violates a constitutional right, he or she still is entitled to qualified immunity unless a plaintiff can demonstrate that: (i) the right was clearly

established at the time of the alleged misconduct by a factually similar Supreme Court or Tenth

Circuit case on point, see Thomas v. Kaven, 765 F.3d at 1194; or (ii) the conduct was "particularly

egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor v.

Riojas, 141 S. Ct. at 54.  See Est. of Smart by Smart v. City of Wichita, 951 F.3d at 1178.  See also

Riggins v. Goodman, 572 F.3d at 1107; Pojoaque, 214 F. Supp. 3d at 1079.  The Court concludes

that Bradshaw is entitled to qualified immunity even though his use of force was objectively

unreasonable, because: (i) he did not violate a clearly established right; and (ii) his conduct was

not sufficiently egregious.

### 1.       The Law Has Not Clearly Established That Bradshaw's Use of Force Against a Non-Threatening Suspect Who Is Armed With a Handgun Violates the Fourth Amendment.

To overcome qualified immunity, a plaintiff usually must point to a prior Supreme Court

or Tenth Circuit decision that clearly establishes the right, and it must be "'sufficiently clear that

every reasonable official would have understood that what he is doing violates that right.'"

Mullenix v. Luna, 577 U.S. at 11 (quoting Reichle v. Howards, 566 U.S. at 664).  Cf. Taylor v.

Riojas, 141 S. Ct. 52.   Courts must not "'define clearly established law at a high level of

generality.'"   Mullenix v. Luna, 577 U.S. at 12 (quoting Ashcroft v. al-Kidd, 563 U.S. at 742).

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has

recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal

doctrine, here excessive force, will apply to the factual situation the officer confronts.'"   Mullenix

v. Luna, 136 S.Ct. at 308 (quoting Saucier v. Katz, 533 U.S. at 205).  To determine whether a right

is clearly established, the Tenth Circuit assesses whether "'existing precedent placed the statutory

or constitutional question beyond debate.'"   Routt v. Howry, 835 F. App'x at 381 (quoting Est. of

Reat v. Rodriguez, 824 F.3d 960, 965 (10th Cir. 2016)).  See Casey v. W. Las Vegas Indep. Sch.

Dist., 473 F.3d 1323, 1327 (10th Cir. 2007)(explaining that, to determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right).

In Analysis § III(A), supra, the Court concludes that Bradshaw's conduct meets the first prong of qualified immunity: his use of force was excessive, because the balance of factors from Graham v. Connor and Estate of Larsen v. Murr weighs against the reasonability of Bradshaw pointing his gun, especially given that Bradshaw's immediately prior conduct provoked Rosales to take precautionary action leading to Bradshaw's use of force.  See Analysis § III(A), supra. Turning to the second prong, the Court concludes that the question how an off-duty officer should respond to an armed suspect is not "beyond debate," Ashcroft v. al-Kidd, 563 U.S. at 741, because the Tenth Circuit has not clearly established the right of an armed but otherwise non-threatening suspect to be free from the threat of deadly force, even where the officer's original conduct provoked the confrontation.

By the time Bradshaw detained and pointed his gun at Rosales in 2018, "the law was clearly established that the display of firearms 'and the pointing of firearms directly at persons . . . should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time.'" Mata v. City of Farmington, 791 F. Supp. 2d 1118, 1154 (D.N.M. 2011)(Browning, J.)(quoting Holland 268 F.3d at 1192).  See Chidester v. Utah Cnty., 268 F. App'x 718, 728-29 (10th Cir. 2008)("It is clearly established that law enforcement officers may not point weapons at suspects that pose no threat."); Holland, 268 F.3d at 1192 ("The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force[, and] should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time."); United States v.

Melendez-Garcia, 28 F.3d at 1052-53 ("[T]he use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that 'the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.'")(quoting United States v. King, 990 F.2d 1552 (10th Cir. 1993)).

The Third, Seventh, and Ninth Circuits similarly have concluded that officers may not point weapons at people who do not pose a threat.  See Washington v. Lambert, 98 F.3d 1181 (9th Cir. 1996); Baker v. Monroe Township, 50 F.3d 1186, 1192-93 (3d Cir. 1995)(holding that although officers conducting a drug raid could place a mother, her seventeen- and fifteen-year-old daughters, and seventeen-year-old son, who were ascending the target residence's stairs, on the ground, the acts of handcuffing them and keeping weapons pointed at them for ten to fifteen minutes while they identified them constituted excessive force); McDonald v. Haskins, 966 F.2d 292, 294 (7th Cir. 1992)(pointing a gun at the head of a nine-year-old boy who posed no threat constituted excessive force).  For instance, the Seventh Circuit explains the severity of drawing a gun without the pretext of a threat:

> The significance of the pointed gun is that it makes the encounter far more frightening than if the officer's gun remains holstered, or even drawn but pointed down at his side; and certainly where the danger of the encounter to the officer, though potentially serious, is not clear and present, the deliberate pointing of a gun at the suspect is problematic.  See United States v. White . . . 648 F.2d [29,] at 34 n. 27.  It would be a sad day for the people of the United States if police had carte blanche to point a gun at each and every person of whom they had an 'articulable suspicion' of engaging in criminal activity.

United States v. Serna-Barreto, 842 F.2d 965, 967 (7th Cir. 1988)(Posner, J.).  See Black v. Stephens, 662 F.2d 181, 189 (3d Cir. 1981)(concluding that sufficient evidence existed to uphold an excessive force verdict under the Due Process Clause of the Fourteenth Amendment, because, "[f]or an unidentified officer to brandish his revolver eighteen inches from Mr. Black's head with Mrs. Black in the precise line of fire and then threaten to shoot, is conduct that shocks the

conscience").

In 2001, the Tenth Circuit in <u>Holland</u> stated that it could "find no substantial grounds for a reasonable officer to conclude that there was legitimate justification" to train their weapons on the plaintiffs without any "reason to believe that the [plaintiffs] posed any kind of threat."  268 F.3d at 1197.  The sheriff in <u>Holland</u> sent a SWAT team to conduct a search and to arrest one individual, and the "officers knew in advance that other persons, including children would be present" at the suspect's residence.  268 F.3d at 1191.  During the search, "the SWAT deputies held each of the [children and two others] at gunpoint, initially forcing several . . . to lie down . . . for ten to fifteen minutes, and ultimately gathering . . . them in the living room . . . where they were held until all but [the original suspect] were released."  <u>Holland</u>, 268 F.3d at 1191.  The Tenth Circuit concludes:

> Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

<u>Holland</u>, 268 F.3d at 1192-93.  In holding that the law was clearly established, the Tenth Circuit concludes that such a "violation [did] not reflect a reasonable mistake of law for which [the officer] should enjoy the benefits of qualified immunity."  268 F.3d at 1197.

Bradshaw distinguishes <u>Holland</u>, in part, by emphasizing that "the law [is not] clearly established . . . [because] [c]ourts do not find constitutional violations for pointing a firearm when there is a reasonable threat of danger or violence to police."  MTD at 5.  Rosales disagrees, and argues that "[i]t is clear . . . [that Bradshaw's conduct] . . . is far from reasonable."  Response to MTD at 7.  Whether the law is clearly established for excessive force does not rely, however, on the reasonableness analysis regarding the officer's use-of-force.  <u>See</u> <u>District of Columbia v. Wesby</u>, 138 S. Ct. at 589 ("'Clearly established' means that, at the time of the officer's conduct,

the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful.")(quoting Ashcroft v. al-Kidd, 563 U.S. at 741).   Here, the Court has already concluded that Bradshaw did not respond reasonably to the threat he perceived.   See Analysis § III(A), supra.   Contrary to the parties' assertions, however, the clearly established analysis turns not on the reasonableness of the officer's response to the threat he perceived, but on whether the constitutional right's

> "contours [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.   This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Hope v. Pelzer, 536 U.S. at 739 (quoting Anderson v. Creighton, 483 U.S. at 640).   The Tenth Circuit has stated that "an officer's violation of the Graham reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as she did."   Casey v. City of Fed. Heights, 509 F.3d at 1286 (quoting Holland, 268 F.3d at 1197).   See Buck v. City of Albuquerque, 549 F.3d at 1291; Mata v. City of Farmington, 791 F. Supp. 2d at 1154.   In other words, to determine whether an officer "should enjoy the benefits of qualified immunity" under the second prong, the Court analyzes not the reasonableness of the officer's conduct, but rather the reasonableness of the officer's "mistake of law" in believing his or her chosen conduct would be lawful.   Holland, 268 F.3d at 1197.

Holland does not clearly establish Rosales' right to be free from Bradshaw's unreasonable use of force in "purposefully rais[ing] his gun at Rosales."   First Amended Complaint ¶ 26, at 5. Although it was unreasonable for Bradshaw to point a firearm at Rosales, who was calm, complied with commands, and kept his hands away from his own firearm, see Analysis § III(A), supra, the

fact that Rosales was armed with a firearm is a distinct departure from Holland's unarmed

bystanders, see 268 F.3d at 1192-93.  Regarding the initial pointing and displaying of weapons,

Holland applies only when there is no "perceived risk of injury or danger to the officers or others."

268 F.3d at 1192.  Rosales implies that no risk could be perceived, because the "Defendant fails

to point to one fact which would suggest that Plaintiff posed a danger to any person" and thus "the

situation was never out of control."  Response to MTD at 9.  Complying, however, with the

Supreme Court's directive to not "'define clearly established law at a high level of generality,'"

Mullenix v. Luna, 577 U.S. at 12 (quoting Ashcroft v. al-Kidd, 563 U.S. at 742), Holland's holding

is not as broad as Rosales suggests.  Although Holland explained that "it may be excessive and

unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply

holding the weapon in a fashion ready for immediate use," Holland dealt with officers who

continued to point guns at unarmed children and other bystanders for an extended time period.

Holland, 268 F.3d at 1191.  Holland's holding, therefore, does not shed much light on what level

of "risk" an officer should "perceive[]" when confronting a suspect armed with an open carry.

268 F.3d at 1192.

In contrast, however, the Tenth Circuit has consistently found justification for the use of

force if an officer encounters a dangerous situation: "[W]e do have a good deal of precedent

indicating that officers may unholster their weapons when they enter 'potentially dangerous

situation[s].'"  In re Est. of Bleck ex rel. Churchill v. City of Alamosa, 643 F. App'x 754, 756

(10th Cir. 2016)(quoting United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)).  See

also Thompson v. City of Lawrence, 58 F.3d 1511, 1517 (10th Cir. 1995)(concluding that officers

may draw their weapons when the situation is volatile and potentially dangerous to them).  Officers

enjoy "leeway in briefly pointing firearms at a suspect when there is some reason to believe a

safety concern exists."  Lopez v. New Mexico, No. CIV 15-0889 JCH/SMV, 2017 WL 3412106, at *10 (D.N.M. March 13, 2017)(Herrera, J.)(citing Henry v. Storey, 658 F.3d 1235, 1238-40 (10th Cir. 2011)(concluding that an officer did not use excessive force, because the officer pointed his weapon at a suspect who he thought had committed a serious felony)); Reeves v. Churchich, 484 F.3d 1244, 1247-49, 1260-61 (10th Cir. 2007)(concluding that the brief pointing of a weapon did not constitute excessive force, in part because the officers were pursuing a suspect who had access to firearms).

        More specifically, officers are given substantial leeway when a suspect is armed.  Compare Thompson v. City of Lawrence, 58 F.3d at 1516 (concluding that officers displaying and carrying their weapons was reasonable while pursuing a suspect "with a reputation for possessing firearms"), with United States v. Melendez-Garcia, 28 F.3d at 1052-53 (concluding that there was no "justification for use of guns or handcuffs in a Terry stop" in part because of the absence of "a reason to believe these particular suspects had guns"); Ealum v. Schirard, 46 F. App'x 587, 597 (10th Cir. 2002)(Henry, J., concurring)(denying qualified immunity in part because "the officers here apparently had no credible belief that anyone in the home was armed"); and Lopez v. New Mexico, 2017 WL 3412106, at *10 (concluding that an officer did not use excessive force when he "pulled his gun on [the suspect] but changed to less lethal force as soon as he saw [the suspect] was not armed").  The Tenth Circuit is not unique in this regard.  See, e.g., Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)("Other relevant factors include . . . the possibility that the suspect may be armed."); Washington v. Lambert, 98 F.3d 1181, 1189 (9th Cir. 1996)(explaining that precedent justifies the "use of especially intrusive means of effecting a stop in special circumstances, such as . . . where the police have information that the suspect is currently armed")(citing United States v. Thompson, 906 F.2d 1292, 1294 (8th Cir. 1990)); United States v.

Greene, 783 F.2d 1364, 1368 (9th Cir. 1986)("Police are entitled to take steps to assure that the person stopped is not armed.")(citing Adams v. Williams, 407 U.S. 143, 146 (1972); Terry v. Ohio, 392 U.S. 1, 23-24 (1968)).

Further, the Tenth Circuit and the Eleventh Circuit consistently justify greater force where an armed suspect possesses a gun, as opposed to weapons with shorter range.  See Walker v. City of Orem, 451 F.3d 1139, 1160 (10th Cir. 2006)(explaining that it is "specifically established that where . . . a suspect was only holding a knife, not a gun . . . it was unreasonable for the officer to use deadly force")(citing Zuchel v. City & Cnty of Denver, 997 F.2d 730, 735-36 (10th Cir. 1993)); Perez v. Suszczynski, 809 F.3d 1213, 1220 (11th Cir. 2016)("[A] person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun."). See also Estrada v. City of Las Cruces, No. CIV 09-10 RB/CG, 2010 WL 11626773, at *8 (D.N.M. Jan. 12, 2010)(Brack, J.); Walker v. City of Orem, 451 F.3d at 1160.

Against the backdrop of this substantial caselaw justifying officers' use of force when confronting armed suspects, especially ones carrying a firearm, the Court can identify only one unpublished district court case where an officer confronting a suspect who possessed a gun during a traffic stop violated the Tenth Circuit's warning that "an officer's aiming a weapon at someone, without more, might constitute excessive force."  Boyd v. Montezuma Cnty. Sheriff's Off., No. 15-CV-0101, 2015 WL 2329119, at *4 (D. Colo. May 12, 2015)(Hegarty, J.)(citing Henry v. Storey, 658 F.3d 1235, 1241 (10th Cir. 2011)).  In Boyd v. Montezuma Cnty. Sheriff's Off., an officer making a traffic stop used harsh language with the passenger and told the driver to exit, at which point the driver told the officer that there was a handgun on the backseat.  See 2015 WL 2329119, at *1.  While the driver was reasoning with the officer, the passenger exited the vehicle with his hands raised and tried to walk away from the confrontation until the detention concluded.

See 2015 WL 2329119, at *1.  After the officer ordered the passenger to return to the vehicle, and the passenger complied, the officer later pointed his gun at him.  See 2015 WL 2329119, at *1. The Honorable Michael E. Hegarty, United States Magistrate Judge for the United States District Court for the District of Colorado, noted "the potential legal consequences of a fact scenario in which [the officer] created a situation by his overreaction," and questioned whether "there was any point that [the officer] did not have control of the [traffic stop]."  2015 WL 2329119, at *5. Magistrate Judge Hegarty reasons: "In light of [the passenger's] unequivocal compliance, it may have been unreasonable . . . for an officer to hold [the passenger] at gunpoint during [a] traffic stop absent some reasonable concern for officer safety" and thus held, relying on Holland, that "the clearly established law does not bar such a claim at this point." Boyd v. Montezuma Cnty. Sheriff's Off., 2015 WL 2329119, at *5-6.

Notwithstanding that Boyd v. Montezuma Cnty. Sheriff's Off. is a district court case by a Magistrate Judge, unlike the passenger in Boyd v. Montezuma Cnty. Sheriff's Off., Rosales was armed with a gun not out of reach on his vehicle's backseat but in his pants pocket.  See First Amended Complaint ¶ 18, at 4.  Rosales alleges that Bradshaw was aware that Rosales was armed before drawing his revolver.  See First Amended Complaint ¶ 21, at 4.  Even viewing the facts in Rosales' favor, Bradshaw drew his weapon in response to seeing a gun in Rosales' pocket.  See First Amended Complaint ¶¶ 30-33, at 5.  Although Bradshaw's aggressive and belligerent conduct is unreasonable, see Analysis § III(A), supra, Bradshaw's decision to aim threateningly his firearm at an armed, if non-threatening, Rosales finds enough support in existing caselaw that it was "a reasonable mistake of law for which" Bradshaw "should enjoy the benefits of qualified immunity." Holland, 268 F.3d at 1197.  Bradshaw's assumption that a suspect with a gun in his pocket during a traffic stop automatically posed a threat that permitted him to threaten deadly force is the category

of mistake of law that qualified immunity aims to shield.  See Pearson v. Callahan, 555 U.S. at

244 ("The principles of qualified immunity shield an officer from personal liability when an officer

reasonably believes that his or her conduct complies with the law.").

The line of cases stemming from Allen v. Muskogee, 119 F.3d at 837, and Sevier v. City

of Lawrence, 60 F.3d at 695, which the Court concludes weighs against the reasonability of

Bradshaw's threat of deadly force under the circumstances' totality, see Analysis § III(A)(1)(b)(ii),

supra, likewise do not establish clearly that Bradshaw violated Rosales' constitutional rights.  See

Bond v. City of Tahlequah, 981 F.3d 808, 825 (10th Cir. 2020)("Bond I")("Having held that a

reasonable jury could find the officers violated the Fourth Amendment under the Allen line of

cases, our analysis of clearly established law narrows to Allen [v. Muskogee] and Sevier [v. City

of Lawrence].").", rev'd, No. 20-1668, 2021 WL 4822664 (U.S. Oct. 18, 2021).  In Bond I, the Tenth

Circuit held that "Allen established that applying lethal force after deliberately or recklessly

manufacturing the need to do so in such a scenario is a constitutional violation."  Bond I, 981 F.3d

at 825–26.  As a result, a "reasonable officer, . . . presumptively aware of our decision in Allen,

would have known that cornering [the suspect] in the garage might recklessly or deliberately

escalate the situation, such that an officer's ultimate use of deadly force would be

unconstitutional."  Bond I, 981 F.3d at 826.  Recognizing this line of cases only establishes

generally that officers must take care not to escalate, by their own actions, non-lethal situations

into lethal ones, the Tenth Circuit in Bond, quoting Est. of Ceballos v. Husk, 919 F.3d 1204 (10th

Cir. 2019), limited the application of its holding to a narrow set of facts:

> Ceballos . . . concludes that Allen . . . clearly established
>
>> that an officer violates the Fourth Amendment when his or her
>> reckless or deliberate conduct results in the need for lethal force or
>> when the officers rely on lethal force unreasonably as a first resort
>> in confronting an irrational suspect who is armed only with a

> weapon of short-range lethality and who has been confined on his own property.

Est. of Ceballos, 919 F.3d at 1219.

Bond I, 981 F.3d at 825.  The Supreme Court, however, found this narrowing insufficient and reversed Bond I.  See City of Tahlequah v. Bond, -- S.Ct. --, No. 20-1668, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021)("Bond II")(per curiam).  In Bond II, after noting that "We need not, and do not, decide . . . whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment," the Supreme Court then reiterated that "[i]t is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  2021 WL 4822664, at *2 (quoting District of Columbia v. Wesby, 138 S. Ct. at 590).  It then analyzed the Allen v. Muskogee line of cases and concluded that the line did not "come[] close to establishing that the officers' conduct was unlawful."  Bond II, 2021 WL 4822664, at *2.

Here, the law was even less established for Bradshaw than it was for the officers in Bond II.  Rosales was not an "irrational suspect who is armed only with a weapon of short-range lethality," and Bradshaw did not use "lethal force unreasonably as a first resort."  Est. of Ceballos v. Husk, 919 F.3d at 1219.  Rosales instead was a suspect armed with a firearm of long-range lethality, and Bradshaw threatened force only after an initial verbal exchange.  Like the Supreme Court in Bond II, the Court can find no precedents, before this case, that clearly establish that an off-duty officer acts in a manner violating a constitutional right when he: (i) follows a traffic misdemeanor suspect home; (ii) blocks his exit from his driveway; (iii) does so without taking precautions, such as official markings on his car or clothing, a dashboard siren, or, in the least, a calm, non-threatening approach to the suspect at the suspect's residence; and then (iv) uses the threat of deadly force in confronting a suspect who is armed with an open-carry firearm.  In fact, in most

scenarios where a law enforcement officer initiates a traffic stop, doing so in the suspect's driveway rather than the side of the road is not, by itself, unlawful.  See United States v. Alvarez, 61 F. App'x 120, at *1 (5th Cir. 2003)(unpublished)("In McLaughlin, we declined to create a rule that automobile drivers are safe if they can make the sanctuary of the nearest private driveway or carport.")(citing United States v. McLaughlin, 578 F.2d 1180, 1183-84 (5th Cir. 1978)); Scher v. United States, 305 U.S. 251, 255 (1938)("[I]t seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and put him under arrest.")  See also United States v. Zabokrtsky, No. 5:19-CR-40089-HLT-1, 2020 WL 1082583, at *4 (D. Kan. March 6, 2020)(Teeter, J.)(explaining that "allowing a driver to decline to stop on a public road and instead retreat onto private property -- which provides a Fourth Amendment sanctuary from the law -- would endanger officers and the public by incentivizing flight from law enforcement," and concluding that, "because Defendant affirmatively led law enforcement to his driveway to conduct the stop . . .[,] Defendant had no more Fourth Amendment protections in his driveway than he would have had in any of the open spaces he passed on the public roadway")(citing State v. Hernandez, 244 Ariz. 1, 6-7, 417 P.3d 207, 212-213 (Ariz. 2018)).

Because no precedent clearly establishes appropriate conduct for off-duty officers who initiate a traffic stop resulting in a confrontation with a suspect armed with a firearm, as soon as Bradshaw saw Rosales exit his car with a gun in his pocket, Bradshaw found himself enmeshed in the "'hazy border between excessive and acceptable force.'"  Saucier v. Katz, 533 U.S. at 206 (quoting Priester v. Riviera Beach, 208 F.3d at 926–927).  Although he was mistaken, he was justified in his belief that deploying the threat of deadly force would be reasonable and lawful. The Court concludes, therefore, that Bradshaw is entitled to qualified immunity, because, although unlawful, his excessive use of force was not so far outside the bounds of clearly established law

as to put its lawfulness "beyond debate."  Ashcroft v. al-Kidd, 563 U.S. at 741.

>       **2.      Bradshaw Is Entitled to Qualified Immunity, Because Pointing a Firearm at a Suspect Without Reasonable Justification is Not Particularly Egregious Such That No Reasonable Officer Would Believe He or She Was Acting Lawfully.**

This lawsuit does not involve an "'obvious case' of a constitutional violation."  Truman v. Orem City, 1 F. 4th at 1240 (quoting District of Columbia v. Wesby, 138 S. Ct. at 590).  Even if there is no case clearly establishing the constitutional right at issue, an officer is not entitled to qualified immunity if the facts are "particularly egregious," and "no reasonable . . . officer could have concluded that" he or she was not offending the Constitution.  Taylor v. Riojas, 141 S. Ct. at 54.  See Truman v. Orem City, 1 F. 4th at 1240 ("The inmate in Taylor could not identify a case in which a court held that an inmate confined to extremely unsanitary cells for six days offends the Constitution.  But the Supreme Court made clear that he did not have to.").  A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."  Hope v. Pelzer, 536 U.S. at 741.  As the Fifth Circuit has stated recently, plaintiffs are "excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 3 F.4th at 206.

In Taylor v. Riojas, where corrections officers housed an inmate for over four days in "shockingly unsanitary cells," including one covered "nearly floor to ceiling, in 'massive mounts' of feces,'" 141 S. Ct. at 53 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)), the Supreme Court held that the Fifth Circuit erred when it granted qualified immunity because of the lack of an on-point precedent case providing fair notice to officers.  See Taylor v. Riojas, 141 S. Ct. at 53.  Although the plaintiff could not identify a case on point, the Supreme Court noted that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally

permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor v. Riojas, 141 S. Ct. at 53.

More recently, the Tenth Circuit held that, even without a prior precedent clearly establishing the law, a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "'obviously egregious.'" Truman v. Orem City, 1 F. 4th at 1240 (quoting District of Columbia v. Wesby, 138 S. Ct. at 590, then Pierce v. Gilchrist, 359 F.3d at 1298). Comparing the facts in Truman v. Orem City to those in Taylor v. Riojas, the Tenth Circuit continued: "Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, . . . any reasonable prosecutor [should] understand that providing [fabricated evidence to] a medical examiner . . . and then putting him on the stand to testify based on that false information offends the Constitution." 1 F. 4th at 1241. This treatment of Taylor v. Riojas does not just ask about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general constitutional principles that courts have already promulgated, because "no reasonable officer" could have concluded the conduct to be lawful, Taylor v. Riojas, 141 S. Ct. at 53.

Here, Bradshaw's conduct is not so egregious as to obviously offend any "general constitutional rule already identified in the decisional law." Hope v. Pelzer, 536 U.S. at 741. To the contrary, caselaw repeatedly indicates that, when a suspect is armed, it is within an officer's discretion to use the threat of deadly force to remove all risk of armed conflict by disarming them

before proceeding with the detention or arrest.  See, e.g., Thompson v. City of Lawrence, 58 F.3d at 1516 (concluding that officers displaying and carrying their weapons was reasonable while pursuing a suspect "with a reputation for possessing firearms"); United States v. Greene, 783 F.2d 1364, 1368 (9th Cir. 1986)("Police are entitled to take steps to assure that the person stopped is not armed.")(citing Adams v. Williams, 407 U.S. 143, 146 (1972); Terry v. Ohio, 392 U.S. 1, 23–24 (1968)).    While Bradshaw's actions may have been unreasonable under the unique circumstances of Bradshaw's encounter with Rosales, they are not "particularly egregious," Taylor v. Riojas, 141 S. Ct. at 54, because they do not approach the degree of misconduct that occurred with the evidence falsification in Truman v. Orem City, 1 F. 4th at 1240, or the prisoner abuse and mistreatment in Taylor v. Riojas, 141 S. Ct. at 54.  As harmful as momentarily placing Rosales in immediate fear for his life may have been, Bradshaw making a traffic stop in Rosales' driveway was not by itself unlawful.  See Analysis § III(B)(1), supra; United States v. Alvarez, 61 F. App'x at *1; 120 United States v. Zabokrtsky, 2020 WL 1082583, at *4.  Rosales arming himself and exiting his vehicle thus reduced the egregiousness of Bradshaw's subsequent threat of force when he drew his own weapon and pointed it at Rosales.  As soon as Rosales disarmed himself, removing the justification for force, Bradshaw discontinued his threat.  See First Amended Complaint ¶¶ 30-33, at 5.  The Court concludes, therefore, that Bradshaw is entitled to qualified immunity, because his conduct did not violate clearly established law and was not particularly egregious.

## IV.    BECAUSE BRADSHAW IS ENTITLED TO QUALIFIED IMMUNITY, THE COURT WILL GRANT THE MTD WITH RESPECT TO ROSALES' FEDERAL CLAIM AND WILL REMAND THE STATE LAW CLAIMS.

Because Bradshaw is entitled to qualified immunity, the Court will grant the MTD with respect to Rosales' Fourth Amendment claim.  The only claims that remain are New Mexico State law claims of assault and battery.  See First Amended Complaint ¶¶ 65-68, at 10.  The Court will deny the MTD with respect to these State law claims, because the Court no longer has

subject-matter jurisdiction to consider them.  Accordingly, the Court will remand the State law claims to Chaves County, Fifth Judicial District Court, New Mexico.

      **IT IS ORDERED** that: (i) the Board of County Commissioners of the County of Chaves' Opposed Motion to Intervene, filed July 27, 2020 (Doc. 5), is granted; (ii) Defendant David Bradshaw's Motion to Dismiss on the Basis of Qualified Immunity and on Other Grounds, filed August 25, 2020 (Doc. 20), is granted with respect to the federal issues and denied with respect to the state law issues; and (iii) the State law claims are remanded to Chaves County, Fifth Judicial District Court, New Mexico.

 

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Patrick McMahon
Heidel, Samberson, Cox & McMahon
Lovington, New Mexico

--and--

Michael Newell
Christan Quiroz
Newell Law Firm
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Daniel J. Macke
Brown Law Firm
Rio Rancho, New Mexico

    *Attorney for Defendant David Bradshaw*

Brandon Huss
David Roman
Mark Drebing
New Mexico Association of Counties
Albuquerque, New Mexico

*Attorneys for Defendant Britt Snyder*

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

*Attorney for Intervenor Board of County Commissioners of Chaves County*